530 So.2d 526 (1988)
STATE of Louisiana
v.
James E. COPELAND.
No. 87-KA-0128.
Supreme Court of Louisiana.
April 11, 1988.
Rehearing Denied September 22, 1988.
*531 William J. Guste, Jr., Atty. Gen., Duncan S. Kemp, III, Dist. Atty., Gail K. Sheffield, Asst. Dist. Atty., for plaintiff-appellee.
Curtis Baham, Gideon Carter, III, Hammond, Kenneth Murchism, for defendantappellant.
DIXON, Chief Justice.
James E. Copeland appeals his conviction for first degree murder and his sentence of death.
The Livingston Parish Grand Jury indicted defendant nineteen-year old Copeland and thirty-seven year old George Brooks[1] for the July 7, 1979 murder of Joseph Cook Owen, an eleven year old boy. Copeland's trial was changed from Livingston Parish to Tangipahoa Parish where a unanimous jury found Copeland guilty as charged.[2] The jury recommended the death sentence based on its finding of two aggravating circumstances: Copeland was involved in the perpetration of an aggravated rape and an aggravated kidnapping, and the offense was committed in an especially heinous, atrocious or cruel manner.
At approximately 9:00 a.m. on Saturday, July 7, 1979, a man cutting firewood in Livingston Parish near the East Baton Rouge Parish border, discovered the body of a young boy dressed in a pair of cutoff jeans; a single barrel shotgun, spent shells and a pair of gloves lay near the body. The man notified the Livingston Parish authorities who in turn notified the East Baton Rouge Parish Sheriff's Department.
When the victim's mother contacted the East Baton Rouge Parish Sheriff's Department on Sunday, July 8, 1979 to file a missing person's report, the department matched the two reports. The body was that of Joseph Cook Owen.
Authorities from East Baton Rouge and Livingston Parishes began a door to door canvass of the child's neighborhood in the hope of finding someone who had seen the child before his death. When two officers knocked at Copeland's door, Copeland answered and after looking at the photos of the victim told the officers that the child was one of the boys who had been at Copeland's house shooting fireworks on the 4th of July. Copeland added that he may have seen the child later in the weekon the 5th or 6th of July.
As Copeland was the only person in the neighborhood who stated that he had seen the boy as late as the 5th or 6th, the officers returned and asked Copeland to come with them to the station for more *532 questioning. Copeland agreed, left a note for Brooks and went with the police.
After arriving at the substation at approximately 5:30 p.m. on Sunday, July 8, Copeland was orally advised of his Miranda rights. At this point, Copeland was not yet a suspect.
One hour later, Copeland was advised in writing of his legal and constitutional rights. Copeland then gave an oral statement of his version of the crime: the child had come over to Copeland's house a little after dark on Friday, July 6, 1979. George Brooks, Copeland's homosexual lover and roommate, told Copeland that he wanted a sexual encounter with the child and took the child into a bedroom.
Copeland stated that he did not have sex with the child; that he stayed in the living room during that time period and went out to the 7-11 Convenience Store for a time. At 3:00 or 3:30 Saturday morning, Brooks brought the child from the bedroom; Brooks tied the child and Copeland gagged him. Brooks then wanted Copeland to go with him and the child to make sure the child did not jump out of the car; Copeland stated that Brooks had given the boy a sleeping aid, Nytol. Brooks had brought Copeland's shotgun with him. They drove out to the field where Brooks untied and ungagged the child. Brooks then took the gun from Copeland who had carried it to the field. At this point, Copeland told Brooks that he wanted no part of this and ran toward the car which was parked about one hundred yards away. When he had run part of the distance to the car, Copeland heard three shotgun blasts; he turned around and saw the child fall toward the right. Brooks then brought the gag and rope back to the car; Copeland threw them from the car window as Brooks and he drove home.
Subsequent to giving the oral statement above, Copeland gave a taped statement, the gist of which is the same as the oral statement. At the conclusion of the taped statement, Copeland agreed that there were neither threats nor coercion to give the statement; that the statement was voluntarily given. Copeland also noted that he did not want to see Brooks at all, "I don't want to talk to him at all or nothing." Copeland was then arrested for first degree murder, aggravated rape, crimes against nature and being a fugitive from Livingston Parish.
Later that day, Copeland agreed to accompany officers to the crime scene where a videotape of the area was made.
On Tuesday, July 10, 1979, Copeland gave a second taped statement which is inconsistent with the first. In this latter statement, Copeland related that both he and Brooks were in the bedroom with the child; that Brooks took off the child's pants and Copeland took off the child's shorts; that both he and Brooks had sexual acts with the child.
Copeland then revealed that at one point the child became ill and the men let him go to the bathroom. Once in there, the child tried to escape through a window but Copeland prevented the escape by kicking in the bathroom door and taking the child back into the bedroom where more sexual acts were performed. At 3:00 or 3:30 a.m., after they tied and gagged the child, they took him to the field where Copeland shot himat least twice. Copeland further stated that "I wasn't sure I was going to kill him until after I pulled the trigger, I didn't know whether I could do it or not."
Copeland concluded the statement by agreeing that no threats, promises or coercions had been made against him and further stated "I did the confession of my own free will."
ASSIGNMENT OF ERROR 1
In this assignment, Copeland argues that the district court erred to his prejudice by granting the prosecutor's challenge for cause of four prospective jurors because of their opposition to the death penalty. Of the four prospective jurors who were excluded, defendant contends that only oneTerry Lee Dunnwas properly excused.
The defendant's right to an impartial jury prohibits the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples *533 against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). The exclusion of potential jurors must be limited to those who are "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings" and to those whose views prevent them from making an impartial decision on the question of guilt. Id. 391 U.S. at 523, n. 21, 88 S.Ct. at 1777, n. 21, cited in Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987).
Louisiana Code of Criminal Procedure 798 incorporates the Witherspoon standard by allowing the state to challenge for cause a juror who would "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial ... or [whose] attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt." C.Cr.P. 798(2).
In this case, Joseph Fleet testified as follows:
"Q Mr. Fleet, do you have any moral, religious, or conscientious scruples against the death penalty?
A I am against it.
Q You are against it?
A Yes.
Q. Mr. Fleet, how long have you been against the death penalty?
A Quite some time now, I guess; I never was for it.
Q Mr. Fleet, is it your position that under no circumstances could you ever vote to inflict the death penalty?
A Well, I figure once you take a person's life that is it, then there is no changing that once a life has been taken so that is kind of drastic as far as I am concerned.
Q Well, it is, and what I am asking is: Is it your testimony that under no circumstances could you ever vote to inflict the death penalty?
A No, I couldn't.
Q You could not under any circumstances?
A No.
Q And could your feelings concerning the death penalty affect your ability to vote in favor of conviction, if conviction for a particular crime could bring about the death penalty?
A I think so if I thought that person might be inflicted, I might change my decision."
Alice Harrison testified as follows:
"Q Do you have any moral or religious scruples that are opposed to the death penalty?
A Yes, I do.
Q And how long have you had these scruples, ma'am?
A All my life, I guess.
Q All of your life?
A Yes.
Q You just don't believe that that is proper punishment, is that correct?
A No.
Q Do you feel this strongly enough that under no circumstances would you ever vote to impose the death penalty?
A No.
Q You would not under any circumstances?
A I don't believe I would; I don't know really because I have never been in that position.
Q But apparently you have devoted some thought to it in the past?
A Well, I have thought about it, yes.
Q And you honestly feel that you would not be able to vote to impose the death penalty?
A No, sir.
Q And do you feel that if the crime that was charged called for the death penalty or called for the imposition of the death penalty that this would in any way influence your decision as to the guilt or innocence of the defendant?
A Yes."
Raymond Clausen testified as follows:
A What I am saying is, sir, I will not serve on a jury that has to make the decision for or against the death penalty.

*534 Q Let me ask this question then.
A Yes, sir.
Q Would you automatically, assuming you were selected on the jury, and the crime charged according to the law could justify the imposition of the death penalty, would it be your testimony that you would automatically vote against the death penalty without regard to any evidence that would be presented to you?
A Mr. Kemp, I repeat myself, I will not serve on a jury at all period if I can beI don't believe in the death penalty. I don't believe in judging anybody.
Q Okay, that is my next question. Do you have religious scruples against sitting in judgment of other people?
A Yes, sir, I do.
Q And that is particularly true where the subject matter would involve the imposition of the death penalty?
A Correct."
Because the substance of the testimony of these potential jurors was that they would automatically vote against the death penalty or could not be impartial, they were properly excluded. This assignment lacks merit.
ASSIGNMENT OF ERROR 2
Next, the defendant contends that the district court erred in denying his challenge for cause of three prospective jurors. He claims that each juror indicated a predisposition to convict the defendant.
The Louisiana Code of Criminal Procedure allows the state or the defendant to challenge a juror for cause on the ground that:
"(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilty or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence." C.Cr.P. 797(2).
However, a trial judge has broad discretion in ruling on challenges for cause. State v. Welcome, 458 So.2d 1235, 1241 (La. 1983). A refusal by a trial judge to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. Id.
Prospective juror Margaret Buckhalter initially stated that she believed that if the defendant were found guilty, he should receive the death penalty regardless of any mitigating circumstances. After the prosecutor explained that the judge would instruct her to consider aggravating and mitigating circumstances before deciding the penalty, Buckhalter admitted that she had been confused by defense counsel's questions and would be able to accept what the judge told her and not decide the penalty until that phase of the trial.
Prospective juror John Lewis Stanza stated that he felt that the defendant would have to prove his innocence. He also stated that he was in favor of capital punishment if the defendant were found guilty. Following questions by the prosecutor, Stanza also admitted that defense counsel had confused him and that he could follow the judge's instructions and could consider reasons mitigating against the death penalty. However, there was no rehabilitation of Stanza on his failure to presume the defendant's innocence.
Prospective juror Marion Duhe, in response to questions from defense counsel, stated that she felt that the defendant must have done something in order to be in court and that he would have to prove to her that he was innocent. She also stated that she was not convinced that the defendant was innocent prior to trial. After the judge explained the presumption of innocence to Duhe, she responded that she could follow the law as explained by the judge and understood that it was the state's burden to prove the defendant's guilt beyond a reasonable doubt.
The judge denied defense counsel's challenge for cause of these jurors. The defense then exercised two of its peremptory challenges to excuse Buckhalter and Stanza. *535 The defense accepted Duhe and she was seated as a juror.
Both Duhe and Buckhalter were sufficiently rehabilitated and the trial court did not abuse its discretion in denying the challenge. Stanza was not sufficiently rehabilitatedhe believed that the defendant had to prove his innocence. Therefore the trial judge abused his discretion in denying the defense's challenge.
However, the defendant here has failed to establish that he was prejudiced by this erroneous ruling. Stanza did not serve on the jury. The defense did not exhaust its peremptory challenges. The defense was not forced to seat an objectionable juror for lack of peremptory challenges nor did the defense accept a questionable juror in hoarding remaining challenges. State v. Vanderpool, 493 So.2d 574, 575 (La. 1986).
ASSIGNMENT OF ERROR 3
In his third assignment, Copeland claims that the trial court erred in denying his motion for individual voir dire of each prospective juror. The prospective jurors were questioned in groups of fourteen; the balance of the prospective jurors was retired while the fourteen were questioned. The jury was completed after two panels of fourteen had been questioned.
There is no provision in our law which prohibits or requires the sequestration of prospective jurors for individual voir dire. State v. Comeaux, 514 So.2d 84, 88 (La. 1987). The trial court has discretion to decide whether the jurors should be called singly or in groups. C.Cr.P. 784, Comment c. Without a showing of "special circumstances," the trial court does not err in refusing requests for individual voir dire. State v. Comeaux, supra. The fact that a case is a capital case does not in and of iself establish the existence of special circumstances. State v. Wingo, 457 So.2d 1159m 1165 (La. 1984).
Here the defendant asserts as a special circumstance the fact that this was a retrial and that at least five prospective jurors advised the court that they knew it was a retrial. One indicated that there was a general discussion of the matter in the hallways in which the pool of prospective jurors was congregated.
Of those five prospective jurors, three were excused for cause and another was excused by the defense. The fifth prospective juror was accepted by the defense after she stated she would presume the defendant's innocence and would wait until the state presented its case before deciding his guilt or innocence. Accordingly, the defendant has made no showing of special circumstances nor has he shown that he was prejudiced by the denial of his request for individual voir dire.
This assignment lacks merit.
ASSIGNMENT OF ERROR 4
Copeland here complains that he was denied an impartial jury of his peers because some jurors knew the defendant was being retried. C.Cr.P. 857 contemplates that the retrial of a case after the granting of a new trial take place "with as little prejudice to either party as if it had never been heard."
Defendant does not show how this knowledge prejudiced him or denied him an impartial jury. Five prospective jurors stated that they heard in the hallways that this was a retrial. No prospective juror stated that he knew any of the particulars of the offense. Those whose answers on voir dire indicated that they would not be able to be impartial were excused.
Moreover, the venue had been changed from Livingston to Tangipahoa Parish before defendant's first trial in 1981. Defendant was not retried until August, 1985 or more than six years after the offense, four years after defendant's first trial, three years after this court's reversal in State v. Copeland, 419 So.2d 899 (La. 1982). There also is no indication that there was any widespread pre-retrial publicity.
Under these circumstances, the defense has not shown that the jury venire was so infected by knowledge of the retrial that a fair trial was impossible.
This assignment lacks merit.
*536 ASSIGNMENT OF ERROR 5
By this assignment, Copeland contends that the district court denied him his privilege against self-incrimination and his right to counsel by denying his motion to suppress the second taped statement that he gave to police. Specifically, defendant alleges that he asserted his right to remain silent, albeit in a limited sense, when he stated at the end of the first taped statement: "I don't want to see George at all for anything; I don't want to talk to him at all or nothing." He claims that this right was violated because his second taped statement was initiated in the presence of Brooks.
Regardless of whether Copeland's indication that he did not want to speak in the presence of Brooks constitutes a valid assertion of his right to remain silent, a review of the facts reveals that Copeland freely gave his second taped statement. Before Copeland offered his version of the offense, the following colloquy took place:
"Dy. Stewart: You've been read your rights, is that right?
James: Yes.
Dy. Stewart: You've signed a rights form?
James: Yes.
Dy. Stewart: Earlier?
James: Yea.
Dy. Stewart: Are you giving this statement of your own free will?
James: Yes.
Dy. Stewart: Uh-you understand that you're being charged-that you're charged with murder?
James: Yea.
Dy. Stewart: You understand that anything you say can belet's get some coffee. Alright, you understand that anything that you say can be used against you in court?
James: Yes.
Dy. Stewart: You still want to give this statement?
James: Yea."
At the end of the statement, the following exchange occurred:
"Dy. Stewart: James, You haveyou gave this statement of your own free will?
James: Yes.
Dy. Robertson: No threats or promises made you.
James: None at all.
Dy. Robertson: No co-coercesion (sic) used against you?
James: No I did the confession on my own free will.
Dy. Stewart: Alright, we're going to have this transcribed and we're going to ask you to sign each and ever (sic) page, are you willing to do that?
James: Yea."
Additionally, there is evidence from the state, through Deputy Stewart, that Copeland requested to see Brooks on July 10, 1979. At the hearing to suppress, Deputy Stewart testified that "James told us he wanted to talk to Brooks. So we brought him in there. He wanted to talk to him alone. We told him we couldn't allow that. So we brought Brooks in and Copeland said he wanted to tell the truth about it." All evidence adduced at the suppression hearing, including that of Brooks, indicated that Brooks was not in the room when the second statement was taped. The transcription of the statement, which Copeland signed, noted "present during the statement are Deputy W. E. Robertson, Jr, Deputy Dillard Stewart and James E. Copeland." At the trial on the merits, Copeland stated that he was not clear if Brooks was in the room during the taping of the statement.
Moreover, at no time did Copeland request an attorney nor did he refuse to answer any questions.
Beyond that, the conversation between Brooks and Copeland in the presence of police officers did not amount to the functional equivalent of interrogation. See Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (taped conversation between defendant and his wife in the presence of police was admissible despite defendant's earlier request for a lawyer).
*537 The second taped statement was properly admitted. This assignment lacks merit.
ASSIGNMENT OF ERROR 6
The defendant claims here that the district court denied him his privilege against self-incrimination and his right to counsel by allowing prosecution witnesses to testify as to statements he made before he had been advised of his right to remain silent and to obtain the assistance of counsel.
Defendant has not briefed this assignment, but a review of the record indicates that defendant is possibly referring to the testimony of Duane Jones of the East Baton Rouge Parish Sheriff's Department who participated in the door to door canvass of the child's neighborhood.
Jones testified that "while we were at [defendant's] residence, he advised us that he had seen the boy ... over at his residence at an earlier date. [The child] had been there with a number of other youths."
"... Miranda warnings are not a prerequisite to admissibility of statements taken by officers during non-custodial, general on-the-scene investigations, surrounding a possible crime, absent a showing that the investigation has passed the investigatory stage and has focused on the accused...." State v. White, 399 So.2d 172, 174 (La. 1981)
At the time that defendant was asked whether he had seen the child, Copeland was not the focus of an investigation. He was merely one of several neighbors to whom the same question was posed. It was not until Copeland reached the police station and other information had been received that he became the focus of the investigation; by that time he had been given his rights.
This assignment lacks merit.
ASSIGNMENT OF ERROR 7
In this assignment, the defendant argues that the district court erred to his prejudice by instructing the jury that it should not be influenced by sympathy in its deliberations.
At the conclusion of the guilt phase of the trial, the judge gave numerous jury instructions. Among these was the charge: "You are not to be influenced by sympathy, passion, prejudice, or public opinion. You are to reach a just verdict." Copeland contends that such an instruction discourages the jury from considering the very mitigating factors concerning a defendant that the legislature has specified in the capital sentence statute.
The jury does not decide the guilt or innocence of a defendant based upon mitigating factors. Accordingly, this instruction was likely intended to direct the jury that in reaching a verdict on guilt or innocence it should not be influenced by sympathy for the victim.
Furthermore, this court has held that a similar instruction even if given during the penalty phase does not unduly prejudice a defendant. State v. Brogdon, 457 So.2d 616, 629 (La. 1984); State v. Watson, 449 So.2d 1321, 1331 (La. 1984). See also California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
This assignment lacks merit.
ASSIGNMENT OF ERROR 8
Here Copeland asserts that the district court erred to his prejudice by failing to grant a mistrial or cautionary instruction when the prosecutor, in his opening statement at the sentencing phase, referred to the duty of appellate courts to review capital sentences.
The prosecutor needlessly risks reversible error when he discusses with the jury the process of appellate review of criminal cases.
In a similar situation, this court stated:
"... If the reference conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or if the reference contains inaccurate or misleading information, then the defendant has not had a fair trial in the sentencing phase, and the penalty should be vacated. But virtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references *538 to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility. The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made." State v. Berry, 391 So.2d 406, 418 (La. 1980) (on rehearing).
In this case, in an attempt to explain the meaning of Article 905 of the Code of Criminal Procedure, the prosecutor stated: "... there is a trial such as this, there is a verdict of guilty, and then there is a recommendation of the death penalty, and the matter goes up on appeal, and then it comes back down, and there is a requirement for a new sentencing hearing that is what 905.1 provides. If an error occurs only during the sentencing hearing which would necessitate the declaration of a mistrial or the granting of a new trial by the trial court or if an appellate court finds an error that occurred only in the sentencing hearing which would necessitate a remand and a new trial, then the trial court shall be empowered to empanel a new jury under the same procedure and so forth."
The prosecutor's remarks here were neither inaccurate nor misleading. Nor did the remarks imply that the appellate court could substitute its judgment as to an appropriate punishment; the comments only referred to the appellate court's ordering of a new trial if it found error. While mention of appellate review in capital cases is to be avoided, the remarks in this case did not serve to lessen the jury's sense of responsibility.
This assignment lacks merit.
ASSIGNMENT OF ERROR 9
Copeland contends that the failure of the district court to respond to jury questions as to the period of incarceration covered by a life sentence constituted prejudicial error.
After the jury had been deliberating for an hour and three-quarters, the foreman returned to the courtroom and asked two questions pertaining to the consequences of a life sentence without benefit of probation, parole or suspension of sentence: (1) "What does life sentence mean in number of years?" and (2) "In this life sentence is pardon possible?" The defendant asserts that the essence of the questions was: "If we don't give the defendant the death penalty, will he ever get out?"
The trial judge responded:
"Those two particular questions I can not answer for you. In a case that I can recall, I am sure almost everybody can, that particular question was answered by the court or it was commented on by the court, and the appellant (sic) courts said that it was not proper for the court or for counsel to comment on that situation. All I can refer you to is the law as it is written and you have that. I can't make any comment on that for fear that it would result in some appellant (sic) procedure."
This court has dealt with an almost identical situation in State v. Kirkpatrick, 443 So.2d 546, 559 (La. 1983). There the jury asked the trial judge: "Does life mean until natural death, or does it mean a predetermined number of years?" and "Life sentence, can there be parole?" The trial judge there refused to answer those questions and emphasized to the jury that the only factors that it could consider in the sentencing phase were the statutory aggravating and mitigating circumstances. We held there that the trial court was correct in refusing to explain the meaning of "life imprisonment" to the jurors.
A discussion of future remedial measures increases the potential for arbitrary decision making by the jury and is irrelevant to the jury's duty. Thus, there is almost a blanket prohibition of these matters. State v. Lindsey, 404 So.2d 466, 487 (La. 1981), after remand, 428 So.2d 420 (La. 1983).
Although in this case the trial judge should have refrained from making any mention of appellate court procedures, his refusal to answer the jury's questions was not error.
This assignment lacks merit.
*539 ASSIGNMENT OF ERROR 10
Next, Copeland contends that the district court erred to his prejudice in giving a burden-shifting jury charge. The judge instructed the jury:
"Criminal intent may be specific or general.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act.
General criminal intent is present when the circumstances indicate that the defendant must have resorted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. General criminal intent is always present when there is specific intent.
Whether criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances. You may presume that the defendant intended the natural and probable consequences of his acts."
Copeland argues that this last sentence shifted the burden of proof to him to prove that he lacked the requisite specific intent to support a verdict for first degree murder.
The due process clause protects a defendant against a conviction except upon proof beyond reasonable doubt of every element of the crime charged. In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The state, therefore, cannot permissibly shift to the defendant the burden of proving an element of the offense by use of a conclusive presumption. A presumption that is not conclusive but which has the effect of shifting the burden of persuasion to the defendant would also be constitutionally deficient. Sandstrom v. Montana, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1983).
The federal constitutional question is whether a reasonable juror could have understood that the charge shifted the burden of persuasion to the defendant. Francis v. Franklin, 471 U.S. 307, 316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985).
The mere use of the word "presume" raises the spectre of a Sandstrom -type problem. For that reason, the preferable instruction is "... you may infer that the defendant intended the natural and probable consequences of his acts ..." Louisiana Judges Bench Book, Vol. 1, § 4.1 (1985).
However, here the permissive "may" immediately preceded "presume." Additionally, that instruction was only one of many given to the jury. Included among the instructions were the following:
"Although you are the sole judges of the law and the facts on the question of guilt or innocence, you have the duty to accept and apply the law as given by the court. You must decide the facts from the testimony and other evidence and apply the law to those facts in reaching your verdict...
You must not single out any of these instructions and disregard others. The order in which the instructions are given does not indicate that one instruction is more important than another ...
The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The defendant is not required to prove that he is innocent. Thus, the defendant begins the trial with a clean slate ...
The burden is upon the state to prove the defendant's guilt beyond a reasonable doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty."
Taking the jury instructions as a whole, we conclude that no reasonable juror would have understood that the burden of proving the element of specific intent had been shifted to the defendant.
This assignment lacks merit.
*540 ASSIGNMENT OF ERROR 11
In this assignment, Copeland argues that his conviction for first degree murder must be reversed because there was no evidence from which a rational juror could have found, beyond a reasonable doubt, that the state had proved the existence of all the elements of the offense.
To establish the crime of first degree murder, the state had to prove three elements: the defendant killed the victim; the defendant had the specific intent to kill the victim; the killing occurred during the commission of one of the predicate crimes specified in R.S. 14:30. Defendant argues that the state did not prove that he had the specific intent to kill the child nor did it prove that the killing occurred during the commission of an aggravated kidnapping or aggravated rape, two of the offenses listed in R.S. 14:30.
Copeland's second taped statement establishes the requisite specific intent to support a conviction for first degree murder:
"Deputy Stewart: When you left the house, did you know at that time you were going to kill him?
James: It wasn't until afterwardsI'd thought about it earlier, but I didn't want to it wasn't until the last minute, it was decidedwell, we'd go ahead and do it, the reason we did it,to it wouldn't be no witnesses at allor nothing like that.... It was on the wayit was on the way there to the filed (sic) that I decided wellmight as well go ahead."
"Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because ... the victim is under the age of twelve years...." R.S. 14:42 A(4). Evidence adduced at trial included: Copeland's admission that he took off the boy's shorts; had sexual acts with him; had more sexual acts after the defendant prevented the child's escape. The coroner's examination resulted in a finding that the child had been sodomized several times.
Although the term used by Copeland"sexual acts"does not explicitly denote that he engaged in anal intercourse with the child, Copeland's admissions, taken together with the coroner's results establish beyond a reasonable doubt that Copeland was a principal in the commission of an aggravated rape.
There is no merit to the defendant's argument that the killing did not occur during the perpetration of the aggravated rape. With Brooks, Copeland raped the child, put him in the car, drove him across the parish line and then killed him. The sexual acts and the subsequent homicide formed one continuous transaction. See State v. Bates, 495 So.2d 1262 (La. 1986).
Aggravated kidnapping is defined as:
"... the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person...." R.S. 14:44.
Seizure of a person with the intent to commit a rape might satisfy the requirement that the perpetrator has the intent to force the victim to give up something of apparent present value. State v. Rault, 445 So.2d 1203, 1213 (La.1984).
However, in this case, there is no evidence that forcing of the child into committing sexual acts would result in his release. The state failed to prove that element of aggravated kidnapping.
To establish the third element of first degree murder, the state only had to prove that the killing occurred during the perpetration or attempted perpetration of one of the enumerated crimes. R.S. 14:30. Thus, although the state failed to prove the *541 existence of an aggravated kidnapping, it did establish that the killing occurred during the commission of an aggravated rape.
This assignment lacks merit.
ASSIGNMENT OF ERROR 12
The defendant here argues that the district court prejudicially erred by failing to provide the jury with complete instructions with regard to the crimes of aggravated rape and aggravated kidnapping, the aggravating circumstances on which the state relied.
In the jury charges during the guilt phase, the judge correctly instructed the jury that one of the elements of first degree murder in this case was the finding that Copeland committed aggravated rape OR aggravated kidnapping. The judge also read the statutory definitions of aggravated rape and aggravated kidnapping.
During the sentencing phase, the judge read to the jury the list of nine statutory aggravating circumstances. The first of those circumstances are:
"... the offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery." C.Cr.P. 905.4.
The judge further instructed: "... before you decide that a sentence of death should be imposed you must unanimously find beyond a reasonable doubt that at least one of the aggravating circumstances existed." During this stage of the proceedings, the judge again read the statutory definitions of aggravated rape and aggravated kidnapping.
The instructions by the judge as to these offenses is neither incomplete, erroneous nor defective.
This assignment lacks merit.
ASSIGNMENT OF ERROR 13
Copeland claims that he was denied his right to effective assistance of counsel.
To establish a claim for ineffective assistance of counsel, a defendant must show both serious errors in representation and the likelihood that the errors prejudiced the defense. This requires a showing that the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).
Effectiveness of counsel is not measured by the number of meritless objections raised. State v. Clark, 492 So.2d 862, 872 (La.1986). We do not discuss those alleged errors, but do review the error most strenuously argued by the defendantthat counsel exerted minimal effort at the penalty phase.
At the penalty phase, both the prosecutor and defense counsel gave opening statements. The prosecutor explained to the jury that if it decided to recommend the death penalty, it had to be by unanimous vote. The prosecutor then stated that the case warranted serious consideration of the death penalty because it involved the commission of three inexcusable crimes: aggravated rape, aggravated kidnapping, first degree murder. The prosecutor read the applicable laws after which he summarized the evidence that he asserted proved the crimes. The prosecutor concluded that the jury should consider both the aggravating and mitigating circumstances and that it should come to peace with "what is the right thing to do."
In his opening, defense counsel emphasized the mitigating factors involved: the defendant's youth; the influence of Brooks over the defendant; defendant's degree of participation in the crimes and his present ability to contribute to society. Defense counsel also discussed the testimony he expected to elicit from two witnesses.
Rather than calling witnesses in the penalty phase, the state chose to rely on the evidence from the guilt phase. Defense counsel elicited testimony from two witnesses: an assistant warden who testified that Copeland was a model prisoner; a minister who related that defendant had been baptized while in prison, regularly attended Bible study classes, and assisted the minister.
*542 Both sides then made brief closing arguments. The prosecutor reiterated that the child was the victim of three inexcusable crimes and that this case warranted serious consideration of the death penalty.
Defense counsel then argued that the defendant had testified truthfully and correctly about his life and that the mitigating factors illustrated the need for compassion. The state very briefly rebutted.
Defense counsel, as this comparison indicates, adequately performed his duty. Although defendant strenuously argues that the closing argument constituted ineffective assistance in that it only comprised fourteen lines, that assertion is meritless. Defense counsel's closing argument focused appropriately on mitigating factors. The state's closing was similarly brief. Effectiveness of counsel is not based on the number of words an attorney uses in argument.
Defendant was adequately represented at every phase of this trial.
ASSIGNMENT OF ERROR 14
Copeland asserts that the imposition of the death penalty in this case is unconstitutional because there is no evidence from which a rational juror could find, beyond a reasonable doubt, that he was a major participant who was recklessly indifferent to human life.
As discussed above, defendant's admissible second taped statement is a confession. Copeland admitted that he decided to kill the child on the way to the field and admitted to shooting him at least twice.
This assignment lacks merit.
ASSIGNMENT OF ERROR 15
By this assignment, defendant argues that the district court erred in denying his motion for a mistrial when a prosecution witness referred to Copeland's prior trial.
On cross-examination, defense counsel asked one of the investigating officers when he had last seen the murder weapon. The officer replied, "whatever the day of the last trial was." Defense counsel did not object at this point, but rather continued to cross-examine the witness. At the state's request, the jury was retired and the prosecutor noted that he had not attempted to elicit testimony regarding the first trial. Defense counsel replied that he did not think that the response by the officer made any difference because as had been evident from the voir dire, jurors were aware that this was a second trial. Defense counsel then moved for a mistrial which the court denied.
The effect of granting a new trial is to set aside the verdict or judgment and to permit retrial of the case with as little prejudice to either party as if it had never been tried. C.Cr.P. 857. In a situation in which the state informs the jury that the accused was convicted of the crime on a previous occasion, the defendant's right to a fair trial, protected by both the federal and state Constitutions, has been violated. State v. Lee, 346 So.2d 682, 684 (La.1977).
In this case, it was in response to defense counsel's questioning that the reference to the earlier trial occurred. There was no clear indication that the "last trial" meant Copeland's earlier trial; as the offense included two defendants one could reasonably conclude that the officer might have been referring to Brooks' trial. Nor was there any mention of Copeland's earlier conviction. The trial judge correctly ruled that the remark did not call for a mistrial because the remark did not inform the jury that the defendant had been previously convicted for the charge for which he was on trial. See State v. Williams, 445 So.2d 1171, 1177 (La.1984).
This assignment lacks merit.
ASSIGNMENT OF ERRORS 16 and 17
Here Copeland contends that the district court erred in admitting photographs and clothing of the victim.
Two 3½ × 4½ inch color photographs depicting the child's body as it was found at the scene of the murder were admitted. In the first photograph, neither the child's head nor the wound is visible because of the angle and the distance from which the photograph was taken. The second photograph reveals the severity and extent of the gunshot wound; approximately half of *543 the right side of the child's face is blown off. Blood spattering is also visible on the feet, right leg and right arm.
Post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, and to provide positive identification of the victim. State v. Brogdon, 426 So.2d 158, 169 (La. 1983), after remand, 457 So.2d 616 (La. 1984). This court will not find that photographs were admitted in error unless they are so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 559 (La.1986).
The first photograph, depicting only the child's body and not the wound, is not gruesome. The second photograph is gruesome. However, the picture was taken at a distance of several feet. It depicts the entire body; no effort was made to focus solely on the facial wound. Hence, there was no error in admitting the photographs.
The blue jean cut-off shorts admitted into evidence were identified as those taken off the body at the morgue. The child was last seen wearing cut-off shorts.
Defendant argues that the shorts bore no relevance and that the prosecutor used the shorts in closing argument to inflame the prejudice of the jury.
The relevancy of the clothing of a murder victim "is self-evident and needs no discussion." State v. Knight, 227 La. 739, 753, 80 So.2d 391, 396 (La.1955), overruled on other grounds, State v. Lee, 331 So.2d 455, 460 (La.1975). There is also no indication as to how the shorts could have inflamed the jury. It does not appear, for example, that the shorts were covered with blood.
These assignments lack merit.
ASSIGNMENT OF ERROR 18
Here the defendant asserts that the district court erred by failing to declare a mistrial or to give a cautionary instruction when the prosecutor attempted to shift the burden of proof to the defendant by commenting on Copeland's failure to prove his innocence.
Specifically, Copeland complains that the prosecutor emphasized two points in his closing argument: (1) that the state did not ask the defendant a single question when he testified; (2) that the defendant had failed to explain how George Brooks obtained the shells for the shotgun.
Closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." C.Cr.P. 774.
The prosecutor merely argued to the jury the questionable credibility of the defendant. He pointed out the inconsistency of the defendant's trial testimony. The defendant stated that he carried the shotgun shells in a leather pouch that was attached to his belt; he then stated that when Brooks put the shotgun up to his shoulder, Copeland ran back towards the car. He estimated that he was fifty yards from the child and Brooks when he heard the shotgun blasts. Three shells were found near the body; one shell was found in the single barrel shotgun. Copeland's testimony left unexplained how Brooks could have fired three shots when the shells were with the defendantfifty yards away. The prosecutor then explained to the jury that he did not cross-examine the defendant because "he is a premeditated liar."
The prosecutor's argument appropriately included conclusions of facts that he drew from the defendant's evidence.
This assignment lacks merit.
ASSIGNMENT OF ERROR 19
The defendant here claims that the prosecutor offered unsworn testimony regarding irrelevant and prejudicial matters and made prejudicial arguments vouching for the truth of the prosecution's case.
Copeland asserts that during the opening statement the prosecutor expressed his personal belief about matters in issue. The prosecutor stated: "I believe ... that after we have presented the evidence to you that we have ... you will arrive at the just verdict" and "we believe that the evidence *544 that will be presented to you will convince you of the same facts." These comments are not reflective of the prosecutor's personal beliefs; they merely indicated his belief as to what the evidence would show. Such comments fall within the permissible scope of C.Cr.P. 766.
The prosecutor also stated: "we feel that in this case if you are not going to ask for the death penalty, then in no other should you." C.Cr.P. 766 permits an explanation of the nature of the charge and the nature of this charge was that it carried with it the possibility of the death sentence. Inasmuch as the reason for the existence of C.Cr.P. 766 is to avoid surprise to the defendant and prevent prejudice, this statement was also permissible. State v. Fields, 342 So.2d 624, 627 (La.1977).
Defendant also complains that the prosecutor offered unsworn testimony when he commented during voir dire: "I object to this line of questioning. The Bible is subject to all kinds of interpretations, and I am a deacon in the First Baptist Church in Kentwood, and I don't necessarily interpret it the way he interprets it." This statement followed defense counsel's reading of Bible passages to a juror in an attempt to rehabilitate the juror who had expressed opposition to the death penalty. The prosecutor's statement was not improper nor can it be considered unsworn testimony.
This assignment lacks merit.
ASSIGNMENT OF ERROR 20
By this assignment, defendant argues that the district court erred in failing to grant a mistrial after receiving evidence that the jury had prayed together at least three times a day during the trial. Alternatively, Copeland requests that this court remand for a hearing to determine whether, by praying together, the jury violated the judge's instructions not to discuss the case among themselves.
After the jurors were sworn in, the judge cautioned them that they were not to talk about the case even among themselves until it was time for deliberations.
At the end of the penalty phase, after the jurors returned a verdict of death, the jury foreman stated:
"For all of those present, I would just like for you to know that it was with much soul searching that we gave yesterday's verdict and today's. That since we had begun this trial as a jury, we have had prayer together at least three times a day. We had prayer before we came into here this morning. We had prayer before and after we returned to the jury box and back in here. And we prayed not only for ourselves but we prayed for James Copeland."
R.S. 15:470 provides for a jury privilege: "No juror ... is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach ... any verdict." This privilege is not absolute and may be overcome by a substantial showing that the defendant was deprived of his constitutional rights. State v. Graham, 422 So.2d 123, 136 (La.1982). Religious services among jurors do not constitute a substantial deprivation of constitutional rights necessary to overcome the prohibition against juror testimony. Id. There is also no indication that the jury discussed any aspect of the case during the prayer services in violation of the judge's no deliberation admonition. There is no reason to remand the case nor was the failure to declare a mistrial an error.
This assignment lacks merit.
ASSIGNMENT OF ERROR 21
By this assignment, Copeland argues that the cumulative prejudicial impact of the numerous errors of the trial court denied him due process of law.
In State v. Graham, supra, the defendant was convicted of second degree murder and sentenced to life imprisonment. There the defendant also assigned cumulative prejudicial impact as an error. This court noted:
"We previously addressed and rejected each of these contentions. Therefore, we will not discuss the merits of each assignment further. Furthermore, the combined effect of the incidences complained of, none of which amounts to *545 reversible error, did not deprive the defendant of his right to a fair trial." State v. Graham, supra at 137.
The qualitative difference between a sentence of life imprisonment and that of death necessitates close scrutiny to ensure fairness. Here, a careful review of each of the defendant's assignments of error revealed no prejudicial error on any single assignment. There is no cumulative prejudicial impact nor is there a denial of due process.
This assignment lacks merit.
CAPITAL SENTENCE REVIEW
Supreme Court Rule 28 and C.Cr.P. 905.9 require that this court review every death sentence to determine whether the sentence is excessive. That determination is made after the court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports a finding of a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in other cases considering both the offense and the offender.
Defendant's final assignments of error are discussed in the context of this review.
The Uniform Capital Sentence Report provides the following information on the defendant. James E. Copeland is a twentyeight year old white male who has never been married, with no children. He was one of two children who was abandoned when he was four years old. Defendant completed the tenth grade and his intelligence level was evaluated as high (I.Q. above 100). Although psychiatric evaluations revealed that defendant could distinguish right from wrong and was able to cooperate in his own defense, the evaluations also determined that defendant had an inadequate personality disorder with sexual deviation. Defendant also had a history of drug abuse. The report also indicates that Copeland was under the influence of drugs at the time of the offense. Copeland was nineteen years old at the time the crime was committed. The Post Sentence Investigation Report (PSI) describes defendant's prior work record as dating back to 1975. Sporadic employment included manual labor such as maintenance, house painter and fruit picker. The PSI also indicates that defendant has no record of prior convictions. However, he was charged in March of 1979 in East Baton Rouge Parish with contributing to the delinquency of a minor. No disposition of that charge was found. The PSI also indicates that defendant is a self-described "bisexual" who earned money as a prostitute after running away from a foster home in the tenth grade. The victim was an eleven year old white male who was casually acquainted with defendant.
PASSION, PREJUDICE OR ARBITRARY FACTORS
Defendant argues that the prosecutor attempted to inflame the jury by making references to the photograph of the child's body during his closing argument in the guilt phase of the trial. Specifically, the prosecutor stated: "Look at this photograph. When you get back in that jury room and you get weak-kneed and you begin to cry and you begin to get overcome, look at this photograph."
The photograph was properly admitted into evidence and depicted the manner of death. Statements of the prosecutor referring to the manner in which the victim was killed are within the proper bounds of closing argument. State v. Moore, 432 So.2d 209, 221 (La.1983); C.Cr.P. 774.
The prosecutor's reference to the photographs depicting the manner of death was appropriate and did not introduce any factor of passion, prejudice or arbitrariness into the proceedings.
Copeland further asserts that the trial judge prejudicially erred in failing to offer an explicit instruction informing the jury that it had the option to recommend a life sentence even if the state proved the existence of an aggravating circumstance.
The trial judge gave the following instructions:
"Before you decide that a sentence of death should be imposed you must unanimously find beyond a reasonable doubt *546 that at least one of the statutory aggravating circumstances existed.
If you find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, you may consider imposing a sentence of death. If, however, you do not unanimously find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, then life imprisonment without benefit of probation, parole, or suspension of sentence is the only sentence that you may impose.
Even if you find the existence of aggravating circumstances, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed. The law specifically provides certain mitigating circumstances. * * *"
The judge's instructions here were neither contradictory nor confusing. The instructions adequately established the constitutional and statutory guidelines for the jury. See State v. Jones, 474 So.2d 919, 932-33 (La.1985).
Defendant's other assertions of arbitrary and prejudicial factorsjury questions as to pardon and parole, a burden-shifting instruction, jury knowledge of retrial, jury violation of no-deliberation rulehave already been reviewed and rejected.
AGGRAVATING CIRCUMSTANCES
The jury found the existence of two aggravating circumstances: that the death occurred during an aggravated rape and kidnapping and (even though not argued by the state), that the offense was committed in an especially heinous, atrocious or cruel manner.
As discussed above, the evidence fully supports a finding that the killing occurred during the commission of an aggravated rape. This court has upheld the death penalty when only one of several aggravating circumstances found by the jury was supported by the evidence. State v. Sawyer, 422 So.2d 95, 101 (La.1982), after remand, 442 So.2d 1136 (La.1983). The adequately supported finding of the existence of one aggravating circumstance is alone sufficient to place the defendant in the category of offenders properly exposed to the possibility of the death sentence. Id.
Although we have stated above that the state did not prove that the killing occurred during the commission of an aggravated kidnapping, it is unnecessary for us to consider whether the evidence supports the jury's finding that the crime had been especially heinous, atrocious or cruel.
PROPORTIONALITY REVIEW
Copeland contends that death in this case is a disproportionate sentence. Specifically he argues that the evidence of statutory and other mitigating circumstances was overwhelming.
Pursuant to C.Cr.P. 905.9.1, § 1(c), this court reviews a death sentence to determine whether the sentence is disproportionate to the penalty imposed in similar cases.
In State v. Brogdon, 457 So.2d 616 (La. 1984), defendant, then nineteen years old, and a seventeen year old co-defendant tortured, raped and killed an eleven year old girl after abducting her from a convenience store. The jury found that the offense was committed during the perpetration of an aggravated rape and that the offense was committed in an especially heinous, atrocious or cruel manner. The defendant had four misdemeanor juvenile convictions and one conviction of theft under $100 on his adult record. Brogdon's death sentence was affirmed.
In State v. Rushing, 464 So.2d 268 (La. 1985), defendant killed a cab driver during an attempted armed robbery. The jury found two aggravating circumstances: that the killing occurred during the perpetration of an armed robbery or a simple robbery and that the offense was especially heinous. At the time of the offense, the defendant was only eighteen years old and had no prior criminal record. The death sentence was affirmed.
In State v. Jones, 474 So.2d 919 (La. 1985), defendant abducted an eleven year old victim after breaking into her home. Defendant had been dating the child's mother. After being taken to a wooded area, the child was beaten, raped and finally *547 strangled. The jury found that the killing had occurred during an aggravated rape and had been committed in an especially heinous manner. This court affirmed, finding the evidence as to the aggravated rape supported the death penalty.
In State v. Loyd, 489 So.2d 898 (La.1986), defendant drove a three year old girl and her mother home. After the mother refused the defendant's offer to come inside, Loyd drove off with the child. He then raped the child anally and vaginally and then drowned her. Defendant was twentyfive years old at the time, had two prior convictions for misdemeanor theft, had two years of college, had been honorably discharged from the military and had a steady work history. After a first penalty hearing in which the jurors recommended the death sentence be set aside, a second penalty hearing resulted in jurors again recommending the death sentence, finding that the killing occurred during an aggravated rape and that the offense was committed in an especially heinous manner. This court affirmed, finding the evidence as to aggravated rape supported the imposition of the death penalty.
In this case, the death sentence imposed is not disproportionate.
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari, or
(d) that court denies his application for rehearing.
LEMMON, J., concurs, but does not join in the unnecessary dicta discussing the sufficiency of the evidence of aggravated kidnapping. See State v. Sawyer, 422 So.2d 95 (1982).

ON APPLICATION FOR REHEARING
PER CURIAM.
We are aware that the rule of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), applies in a case where the failure to instruct on lesser included offenses results from the omission of the trial judge as well as from the operation of state law. Cordova v. Lynaugh, 838 F.2d 764 (5th Cir.1988), cert. denied, ___ U.S. ___, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988); Vickers v. Ricketts, 798 F.2d 369 (9th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). We agree with counsel that the failure of the trial judge to define the lesser included offenses of second degree murder and manslaughter in a capital case may have the effect of withdrawing those verdicts from the jury's consideration and thereby deprive the defendant of due process of law.
Nevertheless, while it would have been far preferable for the trial court to have complied with La.C.Cr.P. art. 803 and instructed the jury on the essential elements of second degree murder and manslaughter, we do not find that the error in this case prejudiced the defendant. In Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 3160, 82 L.Ed.2d 340 (1984), the Supreme Court emphasized that "[t]he element the Court in Beck found essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability the existence of the instruction introduced into the jury's deliberation." In this case, the trial court charged the jury, as required by La.C.Cr.P. art. 814, that second degree murder and manslaughter were responsive verdicts of first degree murder. The court also informed the jury of the penalties provided for those lesser included offenses. The jurors thus knew that a verdict of second degree murder meant a sentence for the defendant of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
During their opening and closing remarks, counsel for both the state and defense *548 informed the jury of the essential elements of second degree murder and told them that the distinction between the two offenses turned on the question of the defendant's intent. The jurors were therefore fully informed that if they shared a reasonable doubt as to the defendant's specific intent to kill the victim, they could return with a verdict that conformed rationally to the evidence at trial and still punish the defendant with a heavy sentence. Under these circumstances, the failure of the trial court to define the lesser included offenses does not appear to have impaired the reliability of the jury's verdict by removing the "third option" and casting the jurors into an "all or nothing" vote to convict the defendant as charged of a capital crime, or not at all. Beck v. Alabama, supra, 100 S.Ct. at 2389.
REHEARING DENIED.
NOTES
[1] State v. Brooks, 505 So.2d 714 (La.1987).
[2] This court reversed Copeland's original conviction. State v. Copeland, 419 So.2d 899 (La. 1982). This appeal stems from the second trial, conducted August 12 through 15, 1985.