STOKER, Judge.
On March 12, 1986 defendant-appellant, Murphy LeBouef, was charged by indictment with first degree murder and attempted first degree murder, violations of LSA-R.S. 14:30 and LSA-R.S. 14:27, respectively. On September 16, 1986 the charges were amended to second degree murder and attempted second degree murder, violations of LSA-R.S. 14:30.1 and LSA-R.S. 14:27, respectively. To these amended charges the defendant pleaded not guilty and not guilty by reason of insanity. A unanimous 12-person jury found defendant guilty as charged on September 23, 1987. Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for the second degree murder convic *366 tion and 50 years at hard labor for the attempted second degree murder conviction, to run consecutively. Defendant appeals the convictions, assigning as errors the following:
1. The trial court erred in that the verdict is not supported by the evidence, since the evidence shows the acts of the defendant did not cause the death of the victim.
2. The trial court erred in denying the defendant’s motion to replace trial counsel without any finding of fact on the defendant’s reasons for so requesting.
3. The trial court erred in that it forced defendant to have appointed counsel, denying defendant’s constitutional right to self-representation.
4. The trial court erred in that it allowed the State to argue its case during voir dire.
Assignment of error No. 4 has not been briefed and is therefore considered abandoned.
FACTS
In 1984 Milton and Louise LeBoeuf bought defendant’s house in order to prevent him from losing it through foreclosure. Defendant is Milton LeBoeuf’s brother. By written agreement, defendant was to be allowed to live in the house, rent-free, for the rest of his life, provided he did not harrass or cause trouble to Milton and Louise. However, because Milton would not loan defendant $500, defendant threatened to sue Milton for improper wiring in the house and would not permit Milton or Louise to enter onto the property without permission. Milton instituted eviction proceedings against his brother. At the hearing on December 23, 1985, defendant was ordered to vacate the property by Christmas Eve or provide a $2,000 bond. Later that night, Milton and Louise Le-Boeuf were in their home watching television when their electricity went out. The couple each procured a flashlight and went outside to the rear of their home to investigate. Once outside, the couple observed, with their flashlights, defendant running from the rear of their house toward a gap in the hedge at the end of their patio. Louise informed her husband that defendant was armed with a gun. On observing the weapon, Milton told his wife to run for safety.
As his wife was departing from the scene (at a slow run, since she had bad knees), Milton observed defendant leveling his gun to shoot. Defendant discharged several rounds from his gun, a .22 caliber semi-automatic rifle. Milton was shot in the neck, but continued to walk toward defendant in order to allow his wife to get away. Louise was screaming as she ran around the comer of the house because she had already been hit. Milton was struck by two more bullets and he fell to the ground. Defendant walked up to his brother and shot him from close range. Milton “played dead” and defendant left him to pursue Louise. By this time Milton had been shot in his arm, back and neck. When defendant left him, Milton got up and ran into his house. A shot was fired through the door. Milton tried to use the telephone, but it was dead.
Louise LeBoeuf was heard screaming as she ran across the street. A neighbor testified he heard a “popping” noise, like firecrackers, and observed a man and a woman in the street. He saw the woman fall, then get up and run to a neighbor’s house. A short time later he observed the man walking casually down the street carrying a gun. He followed him and observed the man place the gun on the ground between two trees and drive away in a white Ford pickup. He took down the license number of the pickup and later brought investigating officers to the gun. It was later determined the gun and truck were both owned by defendant.
Louise, meanwhile, ran to a neighbor’s house, screamed for help and informed the neighbors that she and her husband had been shot by defendant. These neighbors called the police and transported both victims to the hospital.
Louise LeBoeuf was admitted with bullet wounds to both thighs, her right wrist, her back and her abdomen. Two days later, doctors operated on Louise and discovered *367 that one of the bullets had passed through her spleen, abdomen and diaphragm. After various post-operative complications, Louise slowly improved and was released on January 15, 1986. Two days later, Louise was readmitted to the hospital and died of a massive pulmonary embolus.
ASSIGNMENT OF ERROR NO. 1
Defendant contends that the guilty verdict is not supported by the evidence because the cause of the victim’s death was a blood clot which was a direct result of her inactivity and prior health problems. However, the victim’s treating physician, Dr. Kaufman, and the pathologist who performed the autopsy on the victim, Dr. Laga, testified otherwise. Dr. Kaufman stated that the cause of death, a massive pulmonary embolus, or blood clot, was caused by the victim having trauma and major surgery. Dr. Kaufman testified that the facts that the victim was elderly and obese were contributing causes, but the gunshot wound and subsequent hospitalization were the direct causes of the pulmonary embolus which caused her death.
Dr. Laga testified that heart disease and high blood pressure were not contributing causes of her death. He found that the clot formed subsequent to her receiving the gunshot wounds, the clot was caused by the trauma of the gunshot wounds and subsequent surgery, and the gunshot wounds were a substantial factor in causing the victim’s death. Dr. Laga explained the sequence of events as follows:
“She died, as I already mentioned, as a result of — as a delayed type of reaction to the passage of the bullet through her left upper leg. As I mentioned, there are three steps in that. One is the formation of the clot at that site, high caliber, like a snake, forming there. Secondly, at one point in time, as a result of a major effort, whatever, that snake-like structure comes loose and moves and blocks the blood vessels going to the lung. That’s two. Thirdly, the right side of the heart has to work against this obstruction. It did for about eighteen hours_ So there is a direct link between those three. The formation of the clot over a three-, four-week period after the shooting in that leg. Then the second step, the clot coming loose, which result (sic) in movement of the clot and giving her the chest pain, for one thing, when she came in and also difficulty in breathing when she came in. And I am still surprised that the right side of her heart held out for the seventeen or eighteen hours it did against that obstruction. So this is the sequence of events and one cannot be separated from the other.”
In State v. Matthews, 450 So.2d 644 (La. 1984), the court stated as to causation, “In a prosecution for murder, the criminal agency of defendant as the cause of the victim’s death must be established beyond a reasonable doubt.” This court has held that “[i]t is not essential that the act of the defendant should have been the sole cause of death, if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient.” Viewing the evidence in the light most favorable to the prosecution, as mandated by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we conclude that the evidence clearly supports the jury’s finding that defendant’s actions were a substantial contributing cause of Louise LeBouef’s death.
This assignment is without merit.
ASSIGNMENT OF ERROR NO. 2
Defendant contends it was reversible error for the trial court to deny defendant’s motion to replace trial counsel without any finding of fact relative to defendant’s reasons for requesting the replacement. Defendant was represented by two court-appointed attorneys. We find no merit in this contention.
At a hearing on defendant’s motion to substitute counsel on May 2,1986, the trial court heard testimony by defendant that he wanted his appointed counsel replaced because she did not follow his instructions. The court accepted into the record a handwritten record from defendant of the motions he claimed his attorney had not filed. *368 After listening to the testimony of defendant’s counsel, the trial court found no evidence of incompetency of counsel, but found on the contrary that the truth was far otherwise.
At a further hearing on defendant’s motion to substitute counsel, on July 2, 1987, the trial court heard defendant’s complaints that he was not given copies of the motions that had been filed, that he was not provided with copies of the medical reports, the record and transcript and the amount of bond and that his counsel was inadequately prepared. The trial court expressly found defendant’s counsel had been adequate and competent and had been before the court on defendant’s behalf many times already.
At the third and final hearing on defendant’s motion to substitute counsel, his counsel acceded to defendant’s request for an “audit” of the time spent on his case and testified to a cumulative minimum time of 165 hours, plus paralegal time and jail visits. The trial court again denied the motion.
We find no merit in defendant’s contention that the trial court made no findings bearing on defendant’s reasons for requesting replacement of his counsel. If any findings were required, they stand out in the record without any need for the trial court to specifically articulate them.
ASSIGNMENT OF ERROR NO. 3
Defendant contends the trial court committed reversible error in denying his right to self-representation at a hearing of defendant’s pro se motion to represent himself at trial on September 7, 1987, the date of trial. The following colloquy took place between the trial court and defendant:
“THE COURT: For what purpose would you want to act as your own attorney? You are not an attorney, are you?
THE DEFENDANT: No. I’m not.
THE COURT: I don’t mind you participating heavily with your attorneys in the presentation of your case, but they are trained in law and they could be of valuable assistance to you. Whether or not you want them as your attorneys, I’m going to order that they stay here and help you with the trial. If you have something you want them to do, then, you know, we can take that up. But I want to remove the jury before you would say something that might prejudice you.”
Instead of pursuing the question of self-representation, defendant proceeded to argue his rights to a change of venue and to recuse every assistant district attorney in the Fifteenth Judicial District. These motions had previously been ruled on and denied, but defendant also argued that LSA-C.Cr.P. art. 627 and LSA-C.Cr.P. art. 684 are unconstitutional. Defendant made no further efforts to urge his motion for pro se counsel or to represent himself other than by various written motions filed by defendant pro se.
In State v. Seiss, 428 So.2d 444 (La.1983), the court held that absent a justifiable basis, there is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance. Once the trial date has arrived, the question of withdrawal of counsel rests with the discretion of the trial court, and his ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. 428 So.2d at 447.
We find no abuse of the trial court’s discretion in denying defendant’s motion to represent himself.
DECREE
For the reasons assigned the judgment of the trial court is affirmed.
AFFIRMED.