729 So.2d 114 (1999)
STATE of Louisiana
v.
Edward RICHARDSON.
No. 97-KA-1995.
Court of Appeal of Louisiana, Fourth Circuit.
March 3, 1999.
*116 Harry F. Connick, Orleans Parish District Attorney, Karen Godail Arena, Holli Herrle-Castillo, Orleans Parish, Assistant District Attorneys, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Deborah K. Leith, Louisiana Appellate Project, Covington, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge JAMES F. McKAY III, Judge DENNIS R. BAGNERIS, Sr.
PLOTKIN, Judge.
On January 16, 1997, the defendant, Edward Richardson, was indicted for first degree murder, a violation of La. R.S. 14:30. He was tried and convicted of second degree murder, a violation of La. R.S. 14:30.1, on May 7, 1997. On May 23, 1997, he was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant now appeals his conviction and sentence.

FACTS:
Charles Reimonenq testified that he and Arturo Alvear, the victim, were neighbors and friends. Alvear routinely sat on his porch from about 6:00 a.m. or 6:15 a.m. until he left for work, and Reimonenq often saw Alvear in the mornings when Reimonenq left to drive his wife to work, and then again when he returned.
On September 12, 1996 at about 7:00 a.m., Reimonenq had just returned home after taking his wife to work. After about ten minutes he heard the doorbell ring and went to the front door. Reimonenq saw Alvear sitting on his porch, and his head was bleeding in three or four spots. Reimonenq asked Alvear what had happened, and Alvear said that "the little fat boy tried to rob him." Alvear said that "Fat" from down the street had attempted to rob him and beat him with a tire tool. Alvear said he had taken the tire tool away from the perpetrator, and Reimonenq saw it at Alvear's feet on the porch. Reimonenq knew the boy Alvear was naming; everyone called him "Fat." Reimonenq called the police and an ambulance. He put a cold towel on Alvear's head, and the ambulance and police arrived in about ten minutes. Alvear told the police what had happened and informed them "Fat" lived down the street in a green and white house. The police went to the house and returned with the boy. Alvear identified the defendant as the perpetrator.
Officer George Lee testified that he and Officer Reginald Smith were dispatched to 1218 Touro Street on an armed robbery call on September 12, 1996. They spoke to the victim, who had a few bruises and lacerations on the top of his head. The victim said that "Fat" asked him for money and when he refused to comply, "Fat" struck him in the head several times with a tire iron. The victim said that he was able to wrestle the tire iron away, and "Fat," who was dressed in a green shirt, fled down the street to his residence at Touro and St. Claude Streets. The victim pointed out the residence and described it as a green and white house with a fence around it. The officers went to the house, the defendant's mother answered the door, and she said that "Fat" was in the *117 back. She asked what he had done now. "Fat" then walked toward the front door. At that time, he was shirtless and he was "nervous and shaken up." The officers asked where "Fat" had been, and he responded that he had been at home with his mother. However, his mother had already said that "Fat" had just come home. The officers looked for the green shirt in the front room, but were unable to locate it. The officers gave "Fat" his rights, told him he was under investigation, and took him to Reimonenq's porch. The ambulance had arrived, and the EMS technicians were taking care of Alvear. The victim immediately identified "Fat" as the perpetrator. Officer Lee identified the defendant as the person Alvear had said was the one who had struck him.
Officer Reginald Smith corroborated Officer Lee's testimony.
Officer Arthur Harrison testified that he received a call at about 7:30 a.m. on September 12, 1996 to go out to Touro Street. He met Officers Lee and Smith and the victim. Officer Harrison remained with Alvear in the EMS unit while the others went to pick up the defendant. He observed the victim point out and positively identify the defendant as the perpetrator. The victim described the perpetrator and told the officers where he lived. Officer Harrison identified the tire iron, which he retrieved from the porch. The tire iron had blood on it. Officer Harrison identified the defendant as the person whom the victim identified that morning.
Detective Jay Saacks testified that on November 18, 1996 he became involved in the investigation of the homicide of Arturo Alvear. He obtained a copy of the original report and learned that the subject was arrested on the scene. He then checked with the juvenile bureau and discovered that the defendant was being held at the Youth Study Center. He rebooked the defendant with first degree murder. Because of the handling of the tire iron and the time elapsed, fingerprints could not be procured.
Dr. Alvaro Hunt, who worked for the Coroner's Office at the time of Alvear's death, testified that he performed the autopsy on Arturo Alvear, a fifty-two year old male. According to the Charity Hospital records, Alvear had suffered several blows to the head, to the left arm, and to the rib cage with a crowbar. He underwent several surgeries to repair a depressed skull fracture on the left side of the head, the perforated tear or hernia in the diaphragm, the colon where it had come apart, and a tracheotomy during a later post-operative complication of sepsis. Dr. Hunt stated that the injury to Alvear's diaphragm was caused by the trauma he suffered on September 12, 1996.
The hospital operative report declares that Alvear suffered a diaphragmatic hernia with transverse colon perforation; the hernia was repaired and the colon was resected. Dr. Hunt testified that Alvear's death most likely resulted from the problem with the hernia caused by the trauma to the diaphragm. On cross-examination Dr. Hunt stated that according to the protocol, the immediate cause of Alvear's death was sepsis, a poisoning of his system. During the September 16, 1996 surgery to correct the hernia or tear, a piece of bowel and a small amount of fecal matter, which had come through a puncture in the diaphragm, was cut out, and the bowel was stapled back together. When there was leakage, a colostomy was implanted, and the intestines were sewed together again. Because of continuing problems, on September 28, 1996 an exploratory surgery in the abdomen was performed. Alvear suffered cardiac arrest and was unconscious from then until his death. On October 24, 1996, a needle was used to remove fluid from the chest cavity.
Alvear died on November 10, 1996. On redirect examination Dr. Hunt stated that the poisonous feces entered the chest cavity as a result of the injury to the diaphragm. He stated that there was nothing in Alvear's records to indicate any problems during the surgeries. Dr. Hunt concluded that the direct cause of Alvear's death was the traumatic injuries he suffered to the head and chest on September 12, 1996; the injuries produced a perforating injury of the diaphragm. The sepsis and the surgical procedures were secondary complications to the direct cause of death.

ASSIGNMENT OF ERROR ONE:
In this assignment of error, defendant argues that his conviction should be reversed *118 because he suffered prejudice when he was forced to use five peremptory challenges when his challenges for cause were denied.
The five jurors were Suzanne Williams, Dr. Terry Creel, Charles Bradley, Bruce Gordon, and Mary Longacre.
The defendant argues and the State concedes that he can complain of the denial of a challenge for cause even though he used only eleven of his twelve peremptory challenges. The defendant notes that there apparently was no poll of the jurors taken.
After voir dire examination outside the presence of the jury, defense counsel put the following on the record:
Even though the defense did not use all of its twelve challenges, I want the record to reflect that as we got down to the finish line here, the defense was forced to reserve a challenge for Juror Number 55, Mr. Babin. Mr. Babin is a white male, self-employed, who, during the voir dire, testified that he had a daughter who was the subject of an armed robbery. We felt that we had to preserve a challenge for him, and that's why we did not challenge Ms. Touchstone, which we might have ordinarily done, and therefore, I would like to object to the Court's refusal to excuse as cause Juror Number Four, the attorney, Charles Bradley, who is an attorney for Lemle and Kelleher, represents hospitals and nurses and doctors. I think our defense is going to indicate that the hospital killed the decedent in this case
After a discussion as to whether "decedent" or "victim" should have been used, defense counsel continued:
I also object to the Court denying a challenge for cause as to Juror Number Five, Dr. Creel, who teaches at Charity, who we're going to allege are the real culprits in this matter, and in fact, has worked in the emergency room there. And equally as well, to Juror Number 23, Suzanne Williams, the second grade teacher of our defendant here today.
To correct the use of "defendant" instead of "district attorney," defense counsel continued: "Of the district attorney today, who is also a very close friend of the district attorney's aunt...." After a discussion about recording the "giggle factor" between the prosecutor and the juror, defense counsel concluded:
[W]e would challenge for cause - we think that the Court inappropriately denied challenges for cause to Juror Number 20, Mr. Gordon, and Juror Number 28, Ms. Longacre, both of whom freely and openly admitted that they could not swear that they would put their prior unfortunate experiences out of their mind in the assessment of the guilt or innocence of Mr. Richardson.
Afterward the trial court declared:
Well, you said they have to be certain. I thinkI am convinced - and I did view the entire colloquy. I watched them, I observed them, I felt they were sincere, I felt they were direct in attempting to answer your questions as best as they could. And I want to say this about all of them. The same thing with Bradley and Creel and Williamsall five of these objections for cause - each and every one of these people, in my opinion, answered the question as best they could. I felt that each and every one of them were objective. I felt that each and every one of them could be fair and impartial and I think each of them wanted to be here, wanted to give this man a fair trial, and would have given him a fair trial had they been selected on this case. I believe that. I did observe the entire discussion, the entire colloquy, as you say, between yourself and these people, and based upon the entire colloquy and not taking it out of context, not taking the one question or the one answer out of context, I feel that they could be fair and impartial, and I feel that as to each of them.
La. Const. Art. I, § 17 provides that an accused has the right to challenge jurors peremptorily. The amount of peremptory challenges is fixed by law in La.C.Cr.P. art. 799. It provides that in trials of offenses punishable by death or necessarily by life imprisonment, the defendant shall have twelve peremptory challenges. La.C.Cr.P. art. 797 provides:
The state or the defendant may challenge a juror for cause on the ground that:

*119 (1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
In deciding whether to grant a challenge for cause, the trial court must evaluate the juror's responses during the entire voir dire examination. State v. Bourque, 622 So.2d 198, 227 (La.1993). A denial of a challenge for cause based on impartiality is not an abuse of discretion where, after further inquiry and instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially and according to the law and evidence. State v. Copeland, 530 So.2d 526, 534 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). A trial court has great discretion in matters of a juror's fitness to serve, and its rulings on challenges for cause will not be disturbed unless the record of voir dire as a whole reveals an abuse of that discretion. State v. Roy, 95-0638 pp. 4-5 (La.10/4/96), 681 So.2d 1230, 1234, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997).
Prejudice is presumed when a challenge for cause is erroneously denied and all of the defendant's peremptory challenges are exhausted. He need only show that the trial court erroneously denied a challenge for cause. No additional showing of prejudice is required. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280; State v. Mathis, 95-0862 (La.App. 4 Cir. 6/5/96), 675 So.2d 1217, 1220, writ denied, 96-1710 (La.3/21/97), 691 So.2d 79.
However, under La.C.Cr.P. art. 800, a defendant may complain of a ruling refusing to sustain his challenge for cause even if he had not thereafter exercised all of his peremptory challenges. That article states:
A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.
The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
Thus, there is no specific allowance or prohibition for assigning as error the improper denial of a challenge for cause when the defendant has not used all of his peremptory challenges.
However, under La.C.Cr.P. art. 800 (as revised in 1983),[1] a defendant may complain of a ruling refusing to sustain his challenge for cause even if he had not thereafter exercised all of his peremptory challenges. State v. Robertson, 630 So.2d at 1280; State v. Vanderpool, 493 So.2d 574, 575 (La.1986); State v. Mathis, 675 So.2d at 1220. The erroneous denial of a challenge for cause, which forces the defendant to hoard his/her remaining peremptory challenges, provides a theoretical means of avoiding the exhaustion requirement for showing prejudice. See, State v. Vanderpool, 493 So.2d at 575. In such a case a defendant must be able to show some prejudice in order to overcome the requirement of proving that the denial of the *120 challenge for cause affected substantial rights of the defendant under La.C.Cr.P. art. 921. State v. Robertson, 630 So.2d at 1280. If the record contains no support for counsel's bald assertion that the defense began hoarding its challenges in response to the trial court's rulings on the challenges for cause and the argument that a defendant was faced with upcoming jurors who were far less palatable, the argument does not prevail. See State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651.
Even though La.C.Cr.P. art. 800 was amended in 1983 to allow a defendant to argue on appeal that a trial court erred by denying a juror challenge for cause without having used all his peremptory challenges, under the jurisprudence the defendants do not prevail on that argument. Several cases hold that in order to prove error warranting reversal of a conviction and sentence, the defendant must still show (1) the erroneous denial of a challenge for cause and (2) the use of all peremptory challenges. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, 766-67, cert. denied, ___ U.S. ___, 118 S.Ct. 570, ___ L.Ed.2d ___ (1997); State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250, 254, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996); State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683, 686; State v. Komurke, 560 So.2d 986, 988 (La.App. 4 Cir. 1990), writ denied, 566 So.2d 982 (La.1990). Even in a capital case, a defendant must show that he has used all of his peremptory challenges before he may successfully claim that an erroneous denial of a challenge for cause warrants reversal of his conviction. State v. Langley, 711 So.2d at 671. Other cases use a harmless error analysis or fail to find substantial prejudice. State v. Copeland, 530 So.2d at 534; State v. Vanderpool, 493 So.2d at 575.
In State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1281, the Louisiana Supreme Court clearly stated:
Whereas before 1983, a defendant who had been erroneously denied a valid challenge for cause could not even complain about the error on appeal unless he had exercised all his peremptory challenges, under the new version of Article 800, a defendant is now permitted to complain of a ruling refusing to sustain his challenge for cause even if he had not thereafter exercised all of his peremptory challenges. State v. Vanderpool, 493 So.2d 574, 575 (La.1986). See also State v. Copeland, 530 So.2d 526, 535 (La.1988). In such a case, the defendant must be able to show some prejudice in order to overcome the requirement of La.C.Cr.P. art. 921 that "[a] judgment or ruling shall not be reversed by an appellate court because of any error... which does not affect substantial rights of the accused."
In light of this case, the defendant is correct that he need not have used all of his peremptory challenges. However, he still must show actual prejudice, which he is unable to do.
The prosecutor stated during voir dire that prospective juror Suzanne Williams taught her in second grade. Later Williams clarified that she was the prosecutor's sixth grade teacher and considered the prosecutor's aunt a good friend. She said that she was a proud teacher and to some extent it might make a difference to her that her former student was the prosecutor. Later Williams stated that she would not change her mind or her verdict because she knew the prosecutor. Williams explained that she had taught at the same school for years with the prosecutor's aunt; however, recently she would see the aunt a few times a year and talk. The defendant claims that Williams would favor the prosecution under the circumstances. She declared that she could look at the facts and be objective; she said that she could be fair. Williams also stated in response to defense counsel's question, that she "could" swear that her pride in the prosecutor and her friendship with the prosecutor's aunt would not in any way affect her assessment of the case.
Dr. Terry Creel was a victim of an armed robbery, and no one was ever prosecuted for the crime. He stated that he thought he could separate his experience and look at the facts as they applied to the defendant. He and his wife also had a bad experience with a police officer sent to his house because someone broke into his yard. Creel said that he *121 could judge the officers as individuals. Later Dr. Creel said that he was in emergency medicine and trained at Charity Hospital. He stated that he was on the LSU and Charity Hospital faculty, but did not see patients and did not practice at Charity Hospital. The defendant claims that it was unlikely that Dr. Creel would agree with the defense assertions that the hospital's malpractice caused the victim's death. When asked whether his association with Charity Hospital would cause him to favor Charity in its treatment process of the victim, Dr. Creel said that he could be fairly objective about the case. Defendant concentrates on the word, "fairly" arguing that Dr. Creel admitted he could not be totally objective.
Charles Bradley, Jr. was an attorney, who was involved in insurance defense and medical and legal malpractice at the firm of Lemle & Kelleher. He said that he might represent one of the witnesses, Dr. Hunt, the pathologist, in an unrelated civil suit. Bradley said he represented doctors, nurses, and hospitals, but he did not represent Charity Hospital. The defendant argues that Bradley would be predisposed to believe Dr. Hunt, but Dr. Hunt was only a witness, who testified to the victim's cause of death. Bradley answered negatively when he was asked whether his relationship with Dr. Hunt would cause him to give the doctor some measure of credibility.
Bruce Gordon had been the victim of an armed robbery where no perpetrator was ever prosecuted. He stated that he could judge the facts of the case impartially. Mary Longacre had witnessed her boyfriend's murder; he was brutally stabbed. She said that she could be objective. She said that an illegal search by a police officer in the case had caused the charge to be dropped from first degree murder to second degree murder, but she said it would not affect her ability to be impartial. When defense counsel asked Longacre and Gordon to give a solemn oath that they would not let their experiences affect them, they refused. Gordon said that he would put it out of his conscious mind and do everything to insure intellectually that it would not affect him. He would not say that he was one hundred percent certain. Longacre said that she would be fair and hear both sides. She said that she was not prejudiced, but she would not say that she was one hundred percent certain her experience would not affect her decision. The trial court declared that prospective jurors did not have to be one hundred percent certain that they could be objective.
Dale Babin stated that his daughter had been the victim of an armed robbery. However, when he was asked whether it would affect his judgment of the facts of the case, he answered negatively.
Defense counsel argued to the trial court that he had to reserve a challenge for Dale Babin and therefore had to seat an objectionable juror, Sydney Touchstone. However, counsel did not state why Touchstone was a juror who would ordinarily be challenged or how the defendant was substantially prejudiced by the fact that Touchstone became a member of the jury. In brief counsel does not clarify how the defendant was prejudiced. The defendant did not use all of his peremptory challenges. He cannot rely upon bald assertions that he had to hoard challenges because there were less palatable jurors to come. The defendant has failed to show prejudice. Therefore, this assignment lacks merit.

ASSIGNMENTS OF ERROR TWO AND THREE:

HEARSAY:
The defendant contends that the trial court erred by allowing the hearsay testimony of Charles Reimonenq and the police officers at the scene related to Alvear's statement to them about the perpetrator. The State counter-argues that the defendant did not timely object to any of the three witnesses testimony, therefore, he cannot raise the issue on appeal.
La. C.E. art. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La C.E. art. 802 provides: "Hearsay is not admissible except as otherwise provided by this Code or other legislation."
*122 La. C.E. art. 803(2) codifies the "excited utterance" exception to the hearsay rule and permits the admission into evidence of an out-of-court statement that is "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." State v. Winn, 97-2509 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271, 1275; State v. Neville, 96-0137 (La.App. 4 Cir. 5/21/97), 695 So.2d 534, 537, writ denied, 97-1637 (La.12/12/97), 704 So.2d 1180; State v. Henderson, 95-0267 (La.App. 4 Cir. 4/3/96), 672 So.2d 1085, 1089, writ denied, 96-1160 (La.10/11/96), 680 So.2d 648.
Trial court rulings on the admissibility of evidence will not be overturned absent a clear abuse of discretion. State v. Mosby, 595 So.2d 1135, 1139 (La.1992). A defendant cannot raise an issue on appeal if he did not object at the time of the occurrence. La.C.Cr.P. art. 841. Hearsay evidence, to which an objection is not raised, constitutes substantive evidence to be used by the jury; the rule is inapplicable if the hearsay evidence is the only evidence of the offense. State v. Lubrano, 563 So.2d 847, 849 (La.1990). Hearsay evidence, which is improperly admitted into evidence, may be considered harmless error if the reviewing court determines beyond a reasonable doubt that the hearsay evidence did not contribute to the verdict. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Atkins, 97-1278 (La.App. 4 Cir. 5/27/98), 713 So.2d 1168, 1178; State v. Anderson, 450 So.2d 684, 686 (La. App. 4 Cir.1984), writ denied, 452 So.2d 696 (La.1984).
Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."
State v. Wille, 559 So.2d 1321, 1332 (La.1990) (citation omitted).
Regarding Reimonenq, the neighbor who helped the victim and called the police, the State argues that this evidence was permissible under the "excited utterance" exception discussed above. The state is correct.
Reimonenq testified that he heard the doorbell, went to his door, and saw Alvear sitting on his porch with lacerations on his head. Reimonenq testified that Alvear told him that "Fat" had tried to rob him and had struck him with a tire iron when he did not give him any money; Alvear said that he was able to wrestle the weapon away from the perpetrator. Alvear made his statements to Reimonenq immediately after he had been struck repeatedly with a tire iron, which he wrestled away from the perpetrator. His statement to Reimonenq that "Fat" had tried to rob him and then hit him with a tire iron was certainly related to a startling event and Alvear was under the stress of excitement caused by being struck with a tire iron. He had blood running from lacerations on his head at the time. That statement was clearly admissible as an excited utterance. Additionally, defense counsel made no objection during Reimonenq's testimony. There was a bench conference, but it did not occur until after Reimonenq's testimony.
The defendant further complains about the hearsay testimony of Officers Smith, Lee and Harrison. Officers Smith and Lee also testified that Alvear told them that "Fat" had asked for money and then hit him with the tire iron when he gave him nothing; Alvear stated that he wrestled the tire iron away. Alvear indicated to the officers where "Fat" lived. They went to the house and returned with "Fat." Alvear identified the defendant in front of Reimonenq, Officers Smith, Lee, and Harrison. The defendant failed to object to this testimony. However, when Officer Harrison took the stand, he began to recount what Alvear had said to him and defense counsel did object arguing that it constituted hearsay.
Alvear's statement to Officers Smith and Lee, who arrived on the scene ten minutes after Reimonenq telephoned for help was hearsay and did not fall under the "excited utterance" exception.
Alvear had been sitting on the porch and Reimonenq had put a cold towel on his head. Alvear had minutes in which to *123 calm down a little. However, during the testimony of Officers Smith and Lee, defense counsel never objected. After the jury had heard their testimony and that of Detective Saacks, defense counsel put on record that he had moved for a mistrial after Reimonenq's testimony. The court considered the testimony of Reimonenq and the two officers. It found that Alvear's statement to Reimonenq was admissible. It concluded that the two officers' testimony was hearsay but that defense counsel did not object, and, regardless it was merely cumulative.
As for Officer Harrison, defense counsel timely objected to his testimony regarding what the victim told him happened and the trial court sustained the objection and did not allow him to testify any further. Therefore, there was no error with his testimony.

THE DENIAL OF DEFENDANT'S MOTION FOR MISTRIAL:
After the above hearsay was admitted, defense counsel moved for a mistrial. The trial court denied the motion for mistrial. The defendant does not specifically allege under which article in the Code of Criminal Procedure a mistrial should have been granted. However, La.C.Cr.P. art. 775 states, in pertinent part:
A mistrial may be ordered, and in a jury case the jury dismissed, when: ...
(3) there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law; ...
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771...
For the reasons noted above regarding the admission of inadmissible hearsay testimony, namely that the testimony of the two police officers, Smith and Lee, was cumulative and therefore harmless, there was no error in the trial court denying the defense's motion for a mistrial.

ASSIGNMENT OF ERROR FOUR:
The defendant argues that the State did not prove by sufficient evidence that the defendant's actions were the cause of Arturo Alvear's death or that the death occurred during an armed robbery.
To evaluate whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560(1979); State v. Scott, 97-0028 (La.App. 4 Cir. 3/18/98), 709 So.2d 339. However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. The reviewing court is not permitted to consider just the evidence most favorable to the prosecution, but it must consider the record as a whole. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The factfinder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. State v. Mussall, 523 So.2d 1305 (La.1988). "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Scott, 709 So.2d at 341, quoting State v. Smith, 600 So.2d 1319, 1324 (La.1992).
La. R.S. 14:30.1 provides in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or *124 simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Reimonenq testified that immediately after the incident Alvear told him that "Fat" had tried to rob him. Alvear identified the defendant, who was known as "Fat," as the person who tried to rob him and hit him repeatedly with a tire iron. Reimonenq and the officers were present when Alvear made the identification. There was sufficient evidence for a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to have concluded that the defendant was engaged in the attempted perpetration of an armed robbery when he struck Alvear with the tire iron. The defendant was attempting to take money belonging to Alvear from Alvear by use of force or intimidation while armed with a dangerous weapon, a tire iron. La. R.S. 14:64. This argument has no merit.
More difficult is the issue of whether the State proved that the defendant caused the victim's death. At trial, the defense strategy was to blame the hospital; medical malpractice caused the death of Alvear. At a subsequent hearing on a motion for a new trial, the defendant argued that a prior injury was the actual cause of the hernia and resulting death. The latter argument will be discussed later.
Dr. Hunt testified at trial that the injuries Alvear sustained when the defendant struck him with a tire iron were the direct cause of his death. The diaphragmatic hernia with transverse perforation of the colon necessitated surgery, and one of the usual risks of such a surgery is infection. Dr. Hunt concluded that the surgeries and the sepsis were secondary complications to the direct cause of Alvear's death, the injuries inflicted by the defendant. Dr. Hunt's testimony proved that the defendant's actions in striking Alvear were a substantial contributing factor to his resulting death. Thus raising the question if this is sufficient "causation."
The Louisiana Supreme Court discussed causation in State v. Kalathakis, 563 So.2d 228 (La.1990):
A causal relation between the defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime. Causation is a question of fact that has to be considered in the light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. M. Bassiouni, Substantive Criminal Law, Secs. 5, 5.2 (1978). A defendant should not be held responsible for remote and indirect consequences which a reasonable person could not have foreseen as likely to have flowed from his conduct or from those consequences which would have occurred regardless of his conduct. Id.

Id. at 231.
In State v. Matthews, 450 So.2d 644 (La. 1984), the defendant was prosecuted for second degree murder. The defendant and a companion beat the victim until she was unconscious and then left her on the bank of a canal. The victim's body was found in the canal and the coroner determined the cause of death was drowning. The supreme court determined that the beating was a substantial contributing cause of the victim's death even if she rolled, crawled or stumbled into the water and drowned. The conviction for second degree murder was affirmed.
In State v. LeBouef, 532 So.2d 365 (La. App. 3 Cir.1988), the elderly and obese female victim died of a massive pulmonary embolus. She had suffered bullet wounds to both thighs, her right wrist, her back, and her abdomen. Although the cause of her death was a blood clot, the doctors' testified that the clot was caused because the victim suffered the trauma of being shot and underwent major surgery, regardless that her age and obesity were contributing factors. Id. at 367.
In State v. Durio, 371 So.2d 1158 (La. 1979), the victim died of pneumonia after suffering head injuries inflicted by the defendant. The medical experts testified that the probable cause of the pneumonia was the depressed state of the victim's defense systems due to her head injuries and the operation necessitated by them. The court held that the legal cause of her death were the injuries inflicted at the time of her beating. *125 The court cited State v. Wilson, 114 La. 398, 38 So. 397 (1905), which also involved a victim dying of pneumonia after a gunshot wound. The court used the language of Wilson and declared that if the defendant "hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient." Id. at 1163, quoting, State v. Wilson, 38 So. at 397. The court noted that a similar standard for determining causation in fact is approved by LaFave and Scott in their treatise on criminal law. The test adopted there was whether the defendant's conduct was a substantial factor in bringing about the result. Id.
In light of the jurisprudence, the evidence was sufficient to find that defendant caused the death of the victim. If not for the fact that he caused the victim to suffer a hernia when he beat him with a tire iron, the victim would not have needed two corrective surgeries that resulted in the sepsis which ultimately killed him. Moreover, Dr. Hunt specifically testified at trial that the injuries Alvear sustained when the defendant struck him with the tire iron were the direct cause of his death. The evidence sufficiently proved that the defendant's actions were a substantial contributing factor to Alvear's resulting death.

SUPPLEMENTAL ASSIGNMENT OF ERROR:
By this supplemental assignment of error, the defendant argues that the trial court erred in denying his motion for new trial. The hearing on the motion, which was held on two separate days, revealed that the victim had suffered trauma in the area of the hernia prior to the defendant attacking him.
At the hearing, defense counsel explained that Alvear had filed a prior civil suit against HANO for injuries he incurred while he was carrying a heavy appliance down a flight of stairs in 1992. While carrying the appliance, the stairs collapsed and Alvear fell and the appliance landed on his chest, causing injury. Based on this prior injury, defense counsel argued that there was an independent intervening cause relating to a pre-existing injury. It was noted that appellate counsel accidentally discovered the prior civil suit after the trial. The State argued that the medical condition of the victim could have been discovered with due diligence before trial. If the court concluded that it was properly newly discovered evidence, then the defense had to prove that the outcome of the trial would have been different. Deborah Leith, LAP attorney, testified that she was investigating whether someone had filed a civil suit for medical malpractice arising out of Alvear's death. Instead she found the suit filed by Alvear three years before this incident.
At the hearing, LSU fifth year surgery resident Dr. Virginia McDougall testified that she participated in the operation on Alvear on September 16, 1998. She stated that Alvear had a rupture in his diaphragm and his large intestine had gone through the hole and become necrotic. At the time it appeared that the internal injuries were the result of the blow he received in September 1998. Alvear had bruising and some scrapes right under the chest wall on his abdomen. Dr. McDougall said that she was not aware of the prior injury caused by carrying an appliance.
The defendant introduced into evidence: the May 14, 1992 report of Dr. Charles Simmons, who indicated that Alvear had suffered a contusion to the chest; the May 18, 1992 x-ray report, which showed no recent fracture or abnormality; Alvear's petition filed in Civil District Court under number 93-4376, Arturo Alvear v. HANO; and a copy of Alvear's medical records, which were introduced into evidence at the defendant's criminal trial. The defendant argued that Alvear had a pre-existing hernia caused by trauma, and that fact raised a reasonable doubt that the defendant caused the diaphragmatic hernia, which caused Alvear's death. The trial court denied the motion for a new trial.
La.C.Cr.P. article 851(3) provides that a trial court shall grant a new trial whenever "[n]ew and material evidence that, notwithstanding the exercise of due diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or *126 judgment of guilty." In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. The trial court has much discretion in ruling on a motion for new trial. However, if the trial court exercises this discretion arbitrarily and the judgment is unjust, the reviewing court should set aside the judgment and order a new trial. State v. Hammons, 597 So.2d 990 (La.1992); State v. Knapper, 555 So.2d 1335 (La.1990). Furthermore, it is not for the trial judge to weigh the evidence or to determine the guilt or innocence of the defendant; rather the judge must ascertain whether another jury presented with all the evidence, including the newly discovered evidence, would probably reach a different verdict. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Talbot, 408 So.2d 861 (La.1980).
Here, the newly discovered evidence addresses causation. Defendant is arguing that a traumatic injury in 1992 led to the hernia that caused the victim's death in 1996. However, the medical records introduced at the hearing do not support the defendant's assertion that the victim had suffered a prior hernia which was the ultimate cause of his death. Rather, the medical records of Dr. Simmons state that there was "tenderness in the left anterior and left lateral lower rib cage." Also, the x-ray report clearly indicates that there was "no evidence of recent fracture or other significant bony [sic] abnormality and there is no evidence of significant underlying lung or pleural pathology." Mr. Alvear did not return to the doctor after the initial visit. Moreover, the petition for damages filed by Mr. Alvear never alleged that he suffered a hernia as a result of the 1992 injury. Therefore, it is difficult to find a causal connection between a 1992 injury where the defendant suffered no diaphragmatic hernia, and the 1996 hernia caused when the defendant severely beat the victim, which resulted in the victim's death. There is no merit to this assignment of error.

ASSIGNMENT OF ERROR FIVE:
The defendant argues that the trial court erred by denying his motion to reconsider sentence and by imposing an unconstitutionally excessive sentence.
La. R.S. 14:30.1(B) provides that a defendant convicted of second degree murder "shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."
An appellate court reviews sentences for constitutional excessiveness under La. Const. Art. I, § 20. A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment or is the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. Courts have the power to declare a sentence excessive although it falls within the statutory limits. State v. Sepulvado, 367 So.2d 762 (La.1979). The trial court has the authority to reduce a mandatory minimum sentence for a particular offense and offender if the sentence would be constitutionally excessive. State v. Pollard, 93-0660 (La.10/20/94), 644 So.2d 370; State v. Dorthey, 623 So.2d 1276 (La.1993).
At the sentencing the trial court declared that it was required by law to impose a life sentence without benefit of probation, parole, or suspension of sentence. The trial court did not determine that the mandatory life sentence for second degree murder was constitutionally excessive in this case. The defense presented no evidence or testimony at the sentencing to show that the sixteen year-old defendant should not receive the legislatively mandated sentence.
The trial court did not err by sentencing the defendant according to the statute. This assignment lacks merit.

CONCLUSION:
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Prior to the amendment La.C.Cr.P. art. 800 provided that a defendant could not complain of a ruling denying a challenge for cause made by him unless all his peremptory challenges were used before completion of the panel.