11 KIRBY, Judge.
STATEMENT OF THE CASE
Defendant Troy Keys was charged by grand jury indictment on June 2, 1994 with first degree murder, a violation of La. R.S. 14:30. Defendant pleaded not guilty at his June 8, 1994 arraignment. On November 15, 1994, the trial court denied defendant’s motion to suppress the identification. On March 1, 1996, the trial court denied defendant’s motion in limine as to a dying declaration by the victim. On April 10, 1997, after a jury deadlocked, the trial court declared a mistrial. On August 27, 1997, following a second trial, defendant was found guilty of second degree murder. On December 5, 1997 defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, with credit for time served. The trial court granted defendant’s motion for appeal.
*920 FACTS
Sylvia Baxter testified that she was the mother of James Baxter, who was twenty years old when he was murdered. She said the victim had been living with his aunt, Linda Jean Pierre, Elmo Bush, and two children.
[¡(Linda Jean Pierre testified that on March 10, 1994, she was upstairs in her bedroom when Elmo Bush called her downstairs. She found her nephew outside of her front door, shot. The victim told her that he was having trouble breathing, and he said the name “Troy.” A couple days later, Ms. Jean Pierre recorded the license plate number of Troy Keys’ automobile as he drove by. She said she told police that the victim had said the name “Troy.”
Dr. William P. Newman III, qualified by stipulation as an expert on the field of forensic pathology, testified that the victim sustained four gunshot wounds, one fatal, three non-fatal.
Orleans Parish Deputy Civil Sheriff Scott Darrah testified that, while employed as a New Orleans police officer on March 10, 1994, he responded to a call of an attempted armed robbery and shooting at 5997 Tullís Drive. He found the victim being given aid by his aunt and her boyfriend. He said that Mr. Toriano Jordan was also present. Deputy Darrah said that the victim was fairly incoherent, and mumbling something to the effect that he was not going to make it. He observed on the ground near the victim a blue ski mask, several cartridge casings, lead projectiles (bullets and/or fragments thereof), and a medallion belonging to the victim that apparently had been ripped from his neck. Deputy Darrah testified on cross examination that he did not recall Ms. Jean Pierre mentioning the name “Troy” that night, and believed she told him she had been in her living room, when she heard an altercation and some shots outside. Deputy Darrah confirmed on redirect examination that because the individuals at the scene of the homicide were speaking fairly continuously, and all at the same time, and he was monitoring an officer-involved shooting, attempting to preserve the homicide scene, and 13monitoring the progress of an ambulance, it was possible that Ms. Jean Pierre may have given him information he did not record, or did not even hear.
New Orleans Police Crime Lab Officer Peter Cuadrado collected evidence at and photographed the scene of the homicide. He did not check the ski mask collected as evidence for any hair samples, and as far as he knew no one else had done so.
New Orleans Police Crime Lab Officer John Treadaway, qualified by stipulation as an expert in the field of firearms identification, testified that the complete bullet recovered from the body of the victim and the two fragmented bullets were fired from the same weapon. He also said the seven nine millimeter cartridge cases were fired by the same weapon.
New Orleans Police Homicide Detective Norman McCord confirmed that the murder was reported to police at approximately 11:20 p.m. He developed defendant as a suspect, and subsequently prepared a photographic lineup containing defendant’s photograph. On April 1, 1994, Elmo Bush, the only eyewitness he could find, identified defendant’s photograph. Det. McCord said defendant was arrested and his residence searched, but the murder weapon was never recovered.
Elmo Bush testified that on the night in question, at approximately 10:45 p.m., he was downstairs in the apartment when he heard a scuffle outside. He heard someone say, “give it up,” and heard the victim reply that he did not have anything. He turned on the light in the hallway-the outside light was broken-opened the front door, and saw defendant standing over the victim, hitting him with a semiautomatic handgun. The victim, four to five feet from Mr. Bush, was on his hands and knees, and was clutching a ski mask in his right hand. Defendant | ¿swung the gun *921 toward Mr. Bush, but the victim hit defendant’s arm. Defendant fired the gun twice, hitting an upstairs window. Mr. Bush identified a photograph of bullet holes in the upstairs ceiling. He said he partially closed the door when the shooting began, but still saw defendant shoot the victim and run away. Mr. Bush said Tori-ano “Toe” Jordan came out of his apartment next door and was talking to the victim. The victim said, “Troy shot me.” Mr. Bush stated that defendant came to the apartment looking for the victim that morning. He identified defendant in court. Mr. Bush said the victim wore a medallion on a chain around his neck. Mr. Bush stated that the victim said that he could not breathe, and that he was going to die. He said the name “Troy” three or four times. Mr. Bush said that Linda, him and “Toe” were all trying to give information at the same time to the first police officer who arrived at the scene.
Mr. Bush testified on cross examination that he told Officer Darrah he had seen the face of the man who shot the victim, and said he may or may not have told him that the victim had the ski mask in his hand; that the victim said the name “Troy” three or four times; and that defendant had come looking for the victim that morning. He said he recognized the handgun in Troy’s hand as a nine millimeter caliber semiautomatic.
Charles Schlosser Jr., an investigator with the Orleans Parish District Attorney’s Office and retired Lieutenant with the New Orleans Police Department, testified that he was given a license plate number by either Linda Jean Pierre or Elmo Bush during a May 1996 interview. The plate was for a 1993 blue Pontiac Grand Am, which was registered on March 10, 1994 to Cynthia Keys, defendant’s mother.
IsNew Orleans Police Officer Dwayne Scheuermann arrested defendant on April 11, 1994, and subsequently secured consent to search the residence from defendant’s mother, Ms. Cynthia Keys. He found no firearms there.
Toriano Jordan testified that on March 10, 1994 he lived in the 5900 block of Tullís Drive next door to James Baxter, his aunt, and his uncle. Mr. Jordan said he also knew defendant from the neighborhood, and said defendant used to drive what he recalled was a 1989 or 1990 blue car. On the night in question, he was inside of his apartment, and heard about eight gunshots. He went outside and saw the victim on the ground, and heard him say he was going to die. He asked the victim who shot him, but said he did not hear defendant’s reply. Mr. Jordan admitted that he was only in court because the District Attorney’s Office had him jailed because he would not voluntarily testify. He explained that he was scared and did not want to get involved. Mr. Jordan admitted that he had previously told the Assistant District Attorney questioning him that he had heard the victim say “Troy with the blue car.” However, he further testified that he told the Assistant District Attorney that he really had not heard the victim make the statement, but was only repeating what others had said. Mr. Jordan stated that he had seen Troy earlier on the evening of the shooting, when Troy asked Mr. Jordan’s friend if he could use the telephone.
Orleans Parish Deputy Civil Sheriff Scott Darrah testified that he got most of his information at the scene from Toriano Jordan. Mr. Jordan informed him that he had asked the victim who shot him, and the victim replied: “Troy who drives the brand new Grand Am did this to me.” Deputy Darrah also stated that Mr. Jordan indicated that he had seen Troy driving up and down Tullís Drive in a new Grand Am about 7:00 or 7:30 p.m., as if he were looking for something. He did | finot recall Mr. Jordan telling him that Troy had gone to his apartment and asked to use his telephone. Deputy Darrah confirmed on cross examination that Elmo Bush did not mention the name “Troy” to him, but simply stated that the gunman was a black male, five foot three inches *922 tall, weighing one hundred and fifty pounds. Deputy Darrah also acknowledged that Mr. Bush said he had ducked behind the door, and then heard the gunshots. Deputy Darrah said that if he had been given the identity of the perpetrator, he would have included that in his report. Deputy Darrah testified that he heard the victim keep saying that he was not going to make it, but did not hear him say that Troy had shot him.
Cynthia Keys, defendant’s mother, testified that she owned a blue Pontiac. She said she lived in Tall Timbers Estates at the time of the murder, and drove down Tullís Drive to get to her residence.
Defense counsel measured defendant, and stated that measurement for the record-five feet eleven inches. Defendant testified that he was not much taller than he had been then. He also stated that he weighed between one hundred sixty and one hundred seventy pounds, about what he weighed at the time of the homicide. He said he did not remember what he had been doing on March 10, 1994. He knew the victim from the neighborhood, did not know whether he had seen the victim on March 10, 1994, and denied shooting him. Defendant denied asking Toriano Jordan if he could use his telephone. He testified on cross examination that he never had any personal problems with the victim, Toriano Jordan, Elmo Bush or Linda Jean Pierre. He said he had driven his mother’s blue 1993 Grand Am a “a couple of times.” While he did not remember exactly where he had been at 11:20 p.m. on the night of the murder, he said he knew he was inside, either at his mother’s or his father’s. He did not know of anyone who could |7testify as to his exact whereabouts at that time. He denied ever owning a ski mask or a gun, or ever using a gun.

ASSIGNMENT OF ERROR NO. 1

By his first assignment of error, defendant claims the trial court erred in admitting defendant’s purported “dying declaration,” as there was no reliable evidence as to when it was made or its contents.
The alleged statements by James Baxter referring to “Troy,” as testified to by other witnesses, constituted hearsay, as they were offered to prove the truth of the matter asserted, and were not statements made by the declarant while testifying at the present trial. La. C.E. art. 801(C); State v. Castleberry, 98-1388, p. 18 (La.4/13/99), 758 So.2d 749, 765, cert. denied, Castleberry v. Louisiana, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); State v. Raby, 98-1453, pp. 8-9 (La.App. 4 Cir. 6/2/99), 738 So.2d 699, 703. Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Dalton, 99-0902, p. 3 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 181. State v. Richardson, 97-1995, p. 13 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 121, writ denied, 99-1087 (La.9/24/99), 747 So.2d 1119. La. C.E. art. 804(B)(2) provides for an exception to the general rule against the admissibility of hearsay evidence for “[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” See State v. Winn, 97-2509 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271.
Defendant concedes that, at the time the victim would have made any such statements, he would have believed his death was imminent. Defendant essentially Largues that the witnesses who testified as to the dying declarations were not credible, in that their testimony was untruthful and/or inaccurate. Defendant notes that Elmo Bush recounted that the victim said “Troy shot me,” Linda Jean Pierre testified that the victim simply said the name “Troy,” and Deputy Darrah stated that Toriano Jordan reported to him that the victim said “Troy who drives the new Grand Am did this to me.” Toriano Jordan testified that he did not hear the victim say that anyone in particular shot him, but overheard others say that “Troy *923 with the blue car” did it. However, the common thread in each of these statements is the name “Troy,” which is, of course, the most crucial aspect of the declaration. Defendant notes that Officer Darrah was on the scene and, although clearly hearing the victim say that he was not going to survive, never heard the victim say anything about who shot him.
 Defendant argues that the victim’s statements “do not fall within the usual and traditional ‘dying declaration’ exception” because “[t]here is contradictory evidence as to whether a declaration was made and the content of the purported declaration.” This argument is concerned purely with the credibility of the witnesses who testified to the victim’s statements, not to whether they were admissible as dying declarations. The credibility of witnesses is a question of fact left to the discretion of the trier of fact. State v. Clay, 97-2858, p. 6 (La.App. 4 Cir. 3/17/99), 731 So.2d 414, 417. The trier of fact’s determination of credibility should not be disturbed on appeal absent an abuse of discretion. State v. Booth, 98-2065, p. 7 (La.App. 4 Cir. 10/20/99), 745 So.2d 737, 742. The trier of fact at the motion in limine to determine whether witnesses would be allowed to testify as to the victim’s dying declaration(s) was the trial court. The trial court obviously believed the witnesses, and felt that any inconsistencies in their recollection of the 1gvictim’s dying words relative to “Troy” went to the weight of the evidence, for assessment by the trier of fact at trial. It cannot be said that the court’s decision was an abuse of discretion.
Defendant argues that the admission of these statements deprives him of his Sixth Amendment right to confront the witnesses against him. However, when evidence is admissible under a recognized exception to the hearsay rule-including the dying declaration exception-the Confrontation Clause is satisfied when the defendant is permitted to fully cross examine the witnesses to the out-of-court statements at issue. State v, Henderson, 95-0267, p. 7 (La.App. 4 Cir. 4/3/96), 672 So.2d 1085, 1090, writ denied, 96-1160 (La.10/11/96), 680 So.2d 648. In the instant case, defense counsel thoroughly cross examined each witness who purportedly heard the victim’s dying statement(s). Therefore, there was no violation of defendant’s right to confrontation.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

By defendant’s second assignment of error, he argues that the trial court erred in denying his motion for mistrial based on the State’s rebuttal argument as to material facts not in evidence.
In his rebuttal argument, the prosecutor responded to defense counsel’s closing argument attacking the failure of police to test hair samples from the ski mask, stating:
There’s one last item I want to leave you with. I’m sorry, I want to talk a little bit about the hair test. Ladies and gentlemen, I, in fact, had this hair test done. And there was, in fact, hair in this cap. And it was, in fact, let’s assume similar to Troy Keys. Would that convince 1 inyou? Would that be enough to vote guilty because the hair is similar?
Defense counsel objected to the comment, and the trial court overruled the objection. The prosecutor continued, noting that defense counsel could have ordered a comparison test of hair samples, and concluding that the hair issue did not prove anything. Defense counsel objected again, and this time the trial court sustained the objection.
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be *924 confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. La. C.Cr.P. art. provides that, upon motion by a defendant, a trial court may grant a mistrial when, among thing, prejudicial conduct in the courtroom makes it impossible for the defendant to obtain a fair trial. The failure to move for a mistrial and/or admonition precludes the urging of error on the part of the trial court for its failure to grant a mistrial or give an admonishment. State v. Hamilton, 356 So.2d 1360, 1363 (La.1978), overruled on other grounds, State v. Johnson, 94-1379, p. 16 (La.11/27/95), 664 So.2d 94, 101-102. However, the failure to move for a mistrial does not preclude review of the trial court’s failure to sustain a properly made objection. Id.
Defense counsel did not move for a mistrial when making either objection, and does not argue that the trial court improperly overruled his first objection. It cannot be said that the trial court erred in denying defendant’s motion for mistrial, where defense counsel did not move for one.
There is no merit to this assignment of error.
|, -, CONCLUSION
For the foregoing reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED.