NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1484

STATE OF LOUISIANA

VERSUS

JOHN STANLEY

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 289,037
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

MICHAEL G. SULLIVAN
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

AFFIRMED.

James C. Downs
District Attorney
Numa V. Metoyer, III
Assistant District Attorney
Post Office Box 1472
Alexandria, Louisiana  71309
(318) 473-6650
Counsel for:
    State of Louisiana

Michael A. Brewer
Attorney at Law
1330 Jackson Street
Alexandria, Louisiana  71301
(318) 443-4006
Counsel for Defendant/Appellant:
    John Stanley

**SULLIVAN, Judge.**

Defendant appeals his conviction of and sentence for aggravated burglary. We affirm.

### *Facts*

On August 12, 2007, John Stanley kicked in the back door of the residence of Farron Gipson and beat her with a belt and other objects. He was charged with aggravated burglary, a violation of La.R.S. 14:60. Following a trial by jury, Defendant was convicted as charged and was sentenced to serve twenty years at hard labor. He appeals his conviction and sentence and assigns four errors: 1) the State failed to prove venue under La.Code Crim.P. arts. 611-615; 2) the evidence was insufficient to support a conviction of aggravated burglary; 3) the trial court erred in admitting a transcript of Ms. Gipson's statement; and 4) his sentence is excessive.

### *Sufficiency of the Evidence*

Defendant's assignment of error that the evidence presented at trial was insufficient to convict him of aggravated burglary is addressed first because if the argument has merit, he will be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981). *See also State v. Hearold*, 603 So.2d 731 (La.1992).

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson*

1

standard of review. *See Graffagnino*, 436 So.2d at 563, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Freeman,* 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

The supreme court explained in *Hearold*, 603 So.2d at 734, that the sufficiency of the evidence review includes admissible and inadmissible evidence:

> [W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

Louisiana Revised Statutes 14:60 provides, in relevant part:

> Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
>
> (1) Is armed with a dangerous weapon; or
>
> (2) After entering arms himself with a dangerous weapon; or
>
> (3) Commits a battery upon any person while in such place, or in entering or leaving such place.

At trial, the State presented the testimony of four witnesses: two police officers, the victim, and a neighbor of the victim. The police officers and the neighbor testified to facts that established Defendant committed aggravated burglary at Ms. Gipson's home on August 12, 2007, while Ms. Gipson denied Defendant did so. The first witness, Officer Kelly Vickers of the Alexandria Police Department, testified that on August 12, 2007, she was called to 125 Marye Street between 5:20 and 5:25 a.m. and that upon her arrival, she could hear "a loud disturbance going on

2

inside the house." She further testified that she heard a female yelling "get off me, get off of me." Officer Vickers explained that she and another officer then made initial contact at the door with "a black male who identified himself as Tyrone Johnson." According to Officer Vickers, as soon as she and the other officer made contact with "Tyrone Johnson," Ms. Gipson ran out from behind him "with just her bra and like some pajama type clothes on for the bottoms"; her children ran out behind her. Officer Vickers explained that she later learned that "Tyrone Johnson" was actually John Stanley.

Officer Vickers described Ms. Gipson's hair as sticking out and appearing as though it had been pulled. Additionally, she described Ms. Gipson as sweating and having puffy and swollen eyes; having whelps on her back that were red with blood and a laceration in her nose area that was bleeding; and "breathing really hard and frantic." Officer Vickers also testified that Ms. Gipson and her children were screaming and crying and confirmed that she had described Ms. Gipson in her report of the incident as being hysterical.

Officer Vickers related that Ms. Gipson told her that her home was Section 8 housing, that Defendant was not allowed to be there, and that if he was caught there, she would be "put out." According to Officer Vickers, Ms. Gipson further explained that when she would not let Defendant in her front door, he went to the back door and kicked it in and that she attempted to exit the front door, but before she could get the chain lock off the door, Defendant got her to the ground and was hitting her with a belt. Ms. Gipson also told Officer Vickers that Defendant hit her with a broom handle and one of the children's chairs and that Defendant continued beating her for approximately two hours. Officer Vickers further testified that Ms. Gipson told her

3

that she was holding one of her infant twin daughters, who was Defendant's daughter, when Defendant attacked her and that she sheltered the infant in her arms until she could put the infant down safely. Officer Vickers called an ambulance for Ms. Gipson because she was complaining of head, neck, and back pain. According to Officer Vickers, Ms. Gipson's home looked "pretty ransacked." Importantly, she also testified that the back door had been kicked in and that the damage to the door "looked fresh."

Detective Robert Distefano of the Alexandria Police Department investigated this incident. He testified that he met with Ms. Gipson three weeks after the incident to obtain a recorded statement from her. In her statement, Ms. Gipson stated that she and Defendant had been together for three years when this incident occurred. She related that Defendant went to her home and that they started arguing because she told him to leave. She stated that she did not want him at her house because "he was acting crazy that night." According to the statement, Defendant left, then came back about five minutes later, and entered through her back door, which he knew was broken so that all anyone had to do was twist the knob and walk in.

Ms. Gipson further explained in her statement that she was on the couch feeding her baby when she heard the back door opening and tried to get out the front door, which has two locks, but could not get both locks opened before Defendant shut the door. She then stated that she could not fend Defendant off because she had one of her infants in her arms. Ms. Gipson next related that she and Defendant were arguing, when he "all of a sudden just flipped out on me" and started grabbing her, picking things up, and throwing or breaking them. Ms. Gipson also stated that she and Defendant started fighting and indicated that he hit her with his hands and "a belt

4

or whatever." She explained that Defendant would not let her leave the house and that she was later taken to the hospital for tests.

Ms. Gipson then informed Detective Distefano that she did not want to pursue any charges against Defendant:

> Because really that was the first time this ever happened. I already got four kids, two sets of twins, and the second set is for him. While he was out [of jail,] I was, everything was all good and everything. I was getting help with the children. And now that he's been in there, I don't have no help or nothing. And it's been too hard for me since he been in there. And that was the only person I could count on just to help take care of his children and stuff.

Barbara Chew, Ms. Gipson's neighbor, testified that on August 12, 2007, she called the police because she heard children crying, a girl hollering, and a lot of noise near her home. Ms. Chew's home is about nine to ten feet away from the victim's home. She was on her front porch when she heard these sounds next door, and she called 911 to report the matter. On cross-examination, Ms. Chew testified that she could not see through Ms. Gipson's window, she could only hear the noise inside.

At trial, Ms. Gipson's explanation of what occurred the night of August 12, 2007, differed greatly from what she had told Officer Vickers that night and from the statement she had made to Detective Distefano a few weeks later. She testified that she and her four children were at home. She related that she remembered running out of her house to the police when they arrived but denied Defendant kicked in her back door. She admitted that she was wearing a bra and pajama pants but claimed that she was wearing a shirt over her bra and that the shirt was ripped.

Ms. Gipson admitted that Defendant entered her home through the back door but denied that he kicked in the door. Instead, she explained that he simply walked through the back door because it was already broken. She claimed that she told the

5

police officers that Defendant broke the door because she was mad at him and that Defendant was not authorized to be in her home "[j]ust at that time." She admitted telling the police that when Defendant first entered, she tried to leave the house but she could not get the chain off the door. When the State asked Ms. Gipson if she remembered telling the police that Defendant threw her to the ground when she could not get the chain off the door, she denied it, stating, "I had my child in my arms the whole, the majority of the time." In fact, she claimed that Defendant did not put his hands on her while she had her infant in her arms.

Ms. Gipson did testify that she called out for help but claimed that she did so only because Defendant "was trying to hold me from hitting him, and I kept saying get off of me." Ms. Gipson testified that she never told the police officers that Defendant hit her with a belt or a broom handle. She further stated that she did not tell the police officers that Defendant hit her with one of her children's chairs. When asked if the police officers were making up that information, she replied:

> Okay, well, the police officers came out there when they seen me come out the door from him lying about his name, they said they was going to throw any kind of charges on him. So, apparently they could have said that.

Ms. Gipson testified that she had a bump on the side of her head but denied having a laceration on her nose. She explained that the laceration the police officers were likely referring to was the one she has had on her nose for about two years. She also stated that she was not bleeding anywhere when the police officers arrived. The State asked Ms. Gipson if she remembered telling the police officers that she was holding one of her infant twins in her hands when Defendant pushed her on the bed and that she sheltered the child while Defendant was beating her. Ms. Gipson testified as follows:

6

He, no, he didn't. My child, actually, I had done put my child down onto the bed. I didn't have to cover my child or nothing. He ain't [sic] do nothing to me while my child was in my arms.

The State then asked Ms. Gipson if Defendant told her that "if he couldn't have you, that nobody else was going to have you or his children," she replied, "Yeah, he made that statement," and she admitted to telling this information to the police officers.

With regard to her recorded statement that she gave to Detective Distefano three weeks after the incident, Ms. Gipson testified that she remembered making the statement but that she did not recall stating everything contained in the transcription. For instance, Ms. Gipson did not remember telling Detective Distefano that Defendant had "flipped out" on her. When asked if she remembered Detective Distefano asking, "What do you mean, flipped out? What did he do?," she simply read the transcription verbatim, "He started grabbing taking off stuff, taking stuff, picking up, picking it up, throwing it, breaking, breaking stuff in the house."

In her statement, Ms. Gipson told Detective Distefano that Defendant hit her "on the arms with a belt or whatever." However, Ms. Gipson testified again that she did not remember telling this information to Detective Distefano and indicated that the only place she was hit was her head. When the State asked, "I see the word belt in there. Where did that come from," she replied:

I don't know. I was mad at the time. All kind of stuff could have came [sic] out of my mouth. But like I said, the only place that I was hit was my head. That's the only place I got checked for at the hospital, was my head.

The transcribed statement also indicated that Defendant hit Ms. Gipson with his hands, whipped her with a belt, and punched her; however, when questioned about this statement, she indicated that she did not remember telling this to Detective

7

Distefano. Ms. Gipson testified that the transcription correctly stated that she had gone to the hospital for her injury but denied that the hospital ran a CAT scan on her. When asked whether she had made up that statement, she replied, "I -- I just said I told the people all kinds of stuff. I don't know[;] I was mad at the time."

On cross-examination, Ms. Gipson reiterated that Defendant did not kick in the door to her home and explained that after he came into the home she started "going at the mouth a little." She further explained that she and Defendant got into an argument and that she began to raise her voice. She indicated that someone overhearing the argument could have assumed that something harmful was occurring; however, she claimed that if she had been in distress, she could have called the police herself. When defense counsel asked, "at no time did he strike you," Ms. Gipson replied, "No, sir." Defense counsel then asked her to explain how she got the bump on her head. Ms. Gipson testified that Defendant was trying to calm her down, that he grabbed her arms because she was swinging and trying to hit him, that he pushed her against the wall and pulled her toward the couch, and that when he put her on the couch, she hit her head on the wooden arm rest. She testified that she ran out of the house when the police officers arrived:

> Because I wanted him off the top of me. I was mad, and I just wanted him off of me. I just told him to move, and he kept telling me, "No, I'm not getting up 'till you calm down." And I would not calm down. And he kept trying to get me to calm down. When I knew, I thought it was – I really didn't know who it was. And when the door, when there was a knock on the door that's when he got up, and I just went straight out the door, cause I wanted him out.

Ms. Gipson again reiterated that she did not have any welts on her back. She testified that she is an excitable person and that she told the police officers some things that were not true because she was upset and wanted Defendant out of her

8

home. She stated that she lied to the police on the night of the incident and that she was still mad at him three weeks later when she gave the recorded statement. She admitted to telling Detective Distefano the same information that she told the police officers the night of the incident.

On re-direct, Ms. Gipson stated that during the altercation her children were asleep behind a closed door, that they were never up crying that night, that they never ran out of the house that night, and that they did not hear anything that was going on. She further testified that she had to call her aunt to come to her house and stay with them when she went to the hospital.

The jury was presented with two very different renditions of what occurred on August 12, 2007. Ms. Gipson's version differed greatly from her statements to Officer Vickers on that date and to Detective Distefano a few weeks later. It was the jury's duty to consider all the evidence and weigh the credibility of the witnesses. *State v. Dixon*, 04-1019 (La.App. 5 Cir. 3/15/05), 900 So.2d 929. Its determination is supported by the record, and we cannot reweigh the witnesses' credibility on appeal. *Id.* Officer Jenkins' testimony, Ms. Chew's testimony, and Ms. Gipson's statement, when viewed in the light most favorable to the prosecution, establish all the elements of aggravated burglary. It was reasonable for the jury to dismiss Ms. Gipson's retraction of her original statements to Officer Vickers and her taped statement to Detective Distefano in light of her complaint to Detective Distefano that she had no support for Defendant's children because he was in prison. This assignment of error is without merit.

9

*Venue*

Defendant urges that the jury's conviction is flawed because the State failed to prove venue under La.Code Crim.P. art. 611, which requires that all criminal trials take place in the parish where the offense occurred. He contends that the State must establish beyond a reasonable doubt that the offense occurred in Rapides Parish, but it failed to do so.

Louisiana Code of Criminal Procedure Article 615 provides that any allegation of improper venue be raised in advance of trial by a motion to quash and that "[v]enue shall not be considered an essential element to be proven by the state at trial." A defendant must raise the issue of venue before trial by a motion to quash or the issue is waived. *State v. Martin*, 07-1035 (La.App. 5 Cir. 10/28/08), 996 So.2d 1157; *State v. Rideout*, 42,689 (La.App. 2 Cir. 10/31/07), 968 So.2d 1210. This assignment is without merit.

*Ms. Gipson's Statement*

Defendant next asserts that "the trial court erred in admitting the transcript of Ms. Gipson's recorded statement made to Detective Distefano because the tape recording was the best evidence of the victim's statement." During Ms. Gipson's trial testimony, defense counsel made three objections and urged the trial court to play the tape recording of her statement because it was the best evidence of her statement. The transcript of the recording was not admitted during Ms. Gipson's testimony but later, after Detective Distefano's testimony. Detective Distefano testified that the statement appeared to be an accurate transcription of the conversation he had with Ms. Gipson, and the trial court admitted the statement into evidence without any objection from Defendant.

Defendant first argues that the State was permitted to introduce the transcribed statement without first laying a proper foundation. He contends that "there was never any testimony that anyone ever listened to the actual tape." He claims that this is "especially important in a trial where the alleged victim has testified, under oath, that no Aggravated Battery occurred."

Defendant does not contest the State's use of the transcript to impeach Ms. Gipson's credibility. Rather, he contends that the State failed to show that the transcript was an accurate representation of the tape recorded statement and urges that "the original recording should have been produced and introduced in accordance with Louisiana Code of Evidence Article 1002." The State contends that it had the right to impeach the credibility of Ms. Gipson and argues that the transcript became admissible when she was "given an opportunity to admit the facts of the statement and distinctly failed to do so." The State further points out that "the nature of the defense objection was that the tape itself was the best evidence" and urges that, "absent a showing of prejudice to the defendant, a conviction will not be reversed on the ground that the best evidence was not produced," citing *State v. Moore*, 419 So.2d 963 (La.1982) and *State v. Gaskin*, 412 So.2d 1007 (La.1982).

In *State v. McGuffie*, 42,069, p. 8 (La.App. 2 Cir. 8/1/07) 962 So.2d 1111, 1116-17, *writ denied*, 07-2033 (La. 2/22/08), 976 So.2d 1283, the court observed:

> While La. C.E. art. 1002 requires the original document to prove the contents thereof, under La. C.E. art. 1004(1), the original of a writing, recording or photograph is not always required to prove its contents, and other evidence of the contents of a writing, recording, or photograph is admissible if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. The "best evidence" rule is to be applied sensibly and with reason. *State v. Gaskin*, 412 So.2d 1007 (La.1982).

11

Moreover, absent a showing of prejudice, a conviction will not be overturned on the ground that the best evidence was not produced. *Id.*

Unlike *McGuffie*, the tape recording in the present case was not lost or destroyed, and, according to the record, the recording was within the State's possession and available for production at trial. *Gaskin* suggests that even where the original tape recording is available, as was the case here, the trial court's failure to require that the original tape recording be presented to the jury is not reversible error, unless the defendant establishes that he was prejudiced by the prosecution's use of the transcript in place of the original tape recording. *See also, Moore*, 419 So.2d 963; *State v. Bennett*, 341 So.2d 847 (La.1976); and *State v. Bishop*, 98-1147, p. 8 (La.App. 3 Cir. 2/3/99), 734 So.2d 674, 678, *writ denied*, 99-2499 (La. 2/11/00), 754 So.2d 932, where this court held:

> [P]ursant to La.Code Crim.P. art. 921, we will not reverse any ruling on appeal that does not "affect substantial rights of the accused." Here, Defendant does not show how he was prejudiced by any reference in the trial transcript to his first trial. Accordingly, we find no error in the trial court's ruling on that issue. *See State v. Copeland*, 530 So.2d 526 (La.1988), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).

Defendant does not identify any discrepancies between the recorded audiotape and the transcribed statement and does not allege any prejudice due to the introduction of the statement. Furthermore, Ms. Gipson was asked by the State whether she had reviewed the transcription of her statement the morning of trial before she testified and whether it appeared to be correct, and she answered, "Yes"; however, she further testified that she did not remember stating what was in her statement. For these reasons, we find that if the trial court erred in failing to require the State to play the tape recording of Ms. Gipson's statement, that failure does not constitute reversible error.

***Excessive Sentence***

In his last assignment of error, Defendant asserts that his sentence is unconstitutionally excessive. Defendant did not file a motion to reconsider sentence, as required by La.Code Crim.P. art. 881.1; therefore, our review is relegated to a bare claim of excessiveness. *State v. Hargrave*, 05-1027 (La.App. 3 Cir. 3/1/06), 926 So.2d 41, *writ denied*, 06-1233 (La. 11/22/06), 942 So.2d 552.

This court has set forth the following standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784[, p. 3] (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, this court outlined factors an appellate court is to review when deciding whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for

13

similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

Defendant's sentence of twenty years at hard labor is within the statutory sentencing range for aggravated burglary, which carries a maximum penalty of thirty years at hard labor, La.R.S. 14:60, and is in line with other similar cases. *See State v. Walker*, 542 So.2d 756 (La.App. 4 Cir. 1989), where a sentence of twenty-five years at hard labor for a conviction of aggravated burglary was affirmed after the court reviewed cases in which sentences for aggravated burglary ranged from twenty years to thirty-five years.

When sentencing Defendant, the trial court considered the guidelines of La.Code Crim.P. art. 894.1 and determined: 1) probation was not appropriate because this is Defendant's fourth felony; 2) Defendant needs correctional treatment in a custodial environment that can be provided most effectively by his commitment to an institution; 3) a lesser sentence would deprecate the seriousness of the crime; 4) there was actual violence in commission of the offense; 5) weapons, a broom handle, a chair, and a belt, were used; 6) Ms. Gipson initially related to Officer Vickers that she was holding an infant during a portion of the time Defendant was beating her.

The trial court also considered the circumstances of the crime and discussed Defendant's personal history, noting that Defendant was thirty-four years old on the day of the hearing; he went to the twelfth grade; he was employed as a construction worker but was unemployed at the time of his arrest; he is married and has five

children, two are with Ms. Gipson, and one is with his wife; he has been booked forty-three times in Rapides Parish, primarily for contempt, misdemeanors, and parole violations; and he has had a parole violation almost every time he has gone to jail.

Defense counsel presented several mitigating factors: 1) "the victim recanted, and indicated that it was a mutual combat, and that the injury that she sustained to her head was a result of her . . . trying to . . . attack [Defendant]"; 2) Defendant is the father of Ms. Gipson's twins, and she showed no hostility toward him during trial; 3) Ms. Gipson has a "violent temper," stating, "she was hostile all the time that she was on the stand"; 4) Ms. Gipson "outweighs the Defendant by more than 50 pounds, and she was more than able to defend herself."

We have considered the aggravating and mitigating factors herein, as well as the trial court's reasoning for imposing Defendant's sentence, and find that the sentence is not unconstitutionally excessive.

## Disposition

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.